UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILMA COOLIDGE, as Executor of the
Estate of Howard Southard, deceased,

                       Plaintiff,

v.                                         **DECISION AND ORDER**
                                                  10-CV-363S

UNITED STATES OF AMERICA,

                       Defendant.
_____

## I. INTRODUCTION

Plaintiff, as Executor of the Estate of Howard Southard, commenced this action against Defendant, United States of America, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671, *et seq.*, alleging, among other things, medical malpractice and wrongful death.

Currently before this Court is Plaintiff's Motion for Partial Summary Judgment on the issue of liability. (Docket No. 23). Defendant opposes Plaintiff's motion and moves to strike Plaintiff's supporting declaration. (Docket No. 25).

For the following reasons, this Court denies Plaintiff's Motion for Partial Summary Judgment and denies Defendant's Motion to Strike**.**

## II. BACKGROUND

The following facts are undisputed, unless otherwise noted.[1]

---

[1] The facts below are drawn from the uncontested portions of Plaintiff's Rule 56 Statement of Uncontested Facts (Docket No. 23-3), Defendant's Response to Plaintiff's Statement of Uncontested Facts (Document 28), the Declaration of Anne B. Rimmler (Docket No. 23-1), the Declaration of Mary K. Roach (Docket No. 26), as well as deposition testimony contained in the following exhibits: Exhibits I, J, L (Docket No. 23-2); Exhibit F (Docket No. 33-1); Exhibits G, H (Docket No. 33-2).

Howard Southard, Plaintiff's brother, underwent an endovascular abdominal aortic aneurysm repair ("EVAR") at the Veterans Administration Hospital ("VA") in Buffalo, New York, on April 1, 2009, having been referred to the VA by the Veterans Administration Hospital in Bath, New York. (Docket 23-3, ¶ 1; Docket No. 33-1 at 37-38). An EVAR is "a closed procedure," meaning that a stent is placed without making an open surgical incision at the site of the aneurysm. (Docket No. 23-1, ¶ 12). In Southard's case, surgeons inserted a stent endovascularly into Southard's vascular system through his groin and passed it up to the portion of Southard's aorta containing the aneurysm for deployment "within a millimeter or two or three maximum of the ["lowest"] renal artery." (Docket No. 23-2 at 106-107; Docket No. 23-1 ¶ 12; Docket No. 23-2 at 144, 151-156).

Three physicians were present during Southard's surgery. (Docket 23-1, ¶ 8). Dr. Purandath Lall was the attending supervising surgeon. (Docket No. 28, ¶ 2). Dr. Hasan H. Dosluoglu was the Chief of Vascular Surgery and Southard's supplemental surgeon. (Docket No. 23-2 at 100; Docket No. 23-2 at 116). Dr. Mohammad Usman Nasir Khan was a fellowship student in vascular surgery, working under Dr. Lall's supervision. (Docket No. 33-2 at 63-64; Docket 23-2 at 146-148; Docket No. 28, ¶ 2). Drs. Lall and Dosluoglu were employees of the VA. (Docket 28, ¶ 3; Docket 23-2 at 100).

Drs. Lall and Khan performed the aneurysm repair surgery. (Docket 28, ¶ 2). According to Drs. Lall and Dosluoglu, Southard was an excellent candidate for the closed procedure due to the anatomy of his aorta in the area of his aneurysm. (Docket 23-3,¶ 5). Drs. Lall and Khan used a Cook Zenith Flex AAA endovascular stent graft ("Zenith Stent Graft") to perform the EVAR. (Id.)  Drs. Lall and Dosluoglu were certified

in the use of the Zenith Stent Graft at the time of Southard's EVAR procedure; Dr. Khan became certified in its use in June 2009, two months after Southard's surgery. (Docket No. 33-2 at 65; Docket No. 33-1 at 35-36; Docket No. 33-2 at 39-41). Dr. Khan deployed the Zenith Stent Graft under Dr. Lall's supervision. (Id.)

The EVAR resulted in the Zenith Stent Graft covering both of Southard's renal arteries. (Docket 23-3, ¶ 6). A completion angiogram conducted after the Zenith Stent Graft was locked in place revealed that it had occluded blood flow to both renal arteries. (Docket 23-3 at 97; Docket 23-2 at 174-175). All three surgeons then performed a series of unsuccessful operations in an attempt to "reestablish blood flow to the kidneys." (Docket 23-2 at 175, 178-180).

Before the EVAR, both of Southard's kidneys functioned. (Docket 23-3, ¶ 2). After the EVAR, Southard required kidney dialysis and remained hospitalized at the VA until his death in July 2009, four months after the surgery. (Docket 26, ¶ 7; Docket 23-1, ¶ 28).

## III. DISCUSSION

### A. Pending Motions

Plaintiff alleges that Defendant, by its employees, agents and representatives, "carelessly and negligently rendered medical care and treatment to the plaintiff's decedent which was not in accordance with good and accepted medical and surgical practice" and "as a direct and proximate cause of the negligence of defendant, the plaintiff's decedent ... suffered severe, permanent and painful injuries, including conscious pain and suffering, ultimately resulting in his death." (Docket No. 1).

In support of her Motion for Partial Summary Judgment, Plaintiff contends that (1)

the deposition testimony of Southard's three treating physicians constitutes expert medical opinion; (2) Dr. Khan admitted that the occlusion of Southard's renal arteries during the EVAR by the Zenith Stent Graft constituted a deviation from good and accepted medical practice; (3) Dr. Lall conceded that the coverage of decedent's renal arteries more likely than not resulted from operator error; (4) the performance of a confirming angiogram would have prevented the occlusion from occurring; and (5) the theory of *res ipsa loquitur* applies to the claims. (Docket Nos. 23-4, 33, 33-3, 41).

Defendant argues in opposition that (1) Plaintiff failed to submit a report from her expert(s) in admissible form that establishes a deviation from the standard of care or that any such deviation was the cause of the injury; and (2) the Declaration of Anne B. Rimmler must be stricken, because it contains inadmissible hearsay and conclusory and unsupported statements. Defendant urges this Court to strike the declaration in full, but concedes that 11 of the 15 exhibits attached to the declaration are admissible. (Docket Nos. 27, 34, 37).

**B.  Defendant's Motion to Strike**

**1.  Applicable Law**

An affidavit or declaration used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). Declarations, however, "often do not rest entirely on personal knowledge, and it is expected that some advocacy will appear" as it is expected that the declaration will be used for the purpose of introducing documents or other evidence into the record. *Degelman Indus. Ltd. v. Pro-Tech Welding and*

*Fabrication, Inc.,* No. 06-CV-6346T, 2011 WL 6752565, at *4 (W.D.N.Y. Dec. 23, 2011).

"The principles governing admissibility of evidence do not change on a motion for summary judgment," and "only admissible evidence" may be considered by the district court. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009). "Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact ... it is appropriate for districts courts to decide questions regarding the admissibility of evidence on summary judgment." *Id.* (internal quotations and citations omitted). Courts may consider any material usable or admissible at trial when considering a summary judgment motion. *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012); *see Raskin,* 125 F.3d at 65 (noting that a district court "has broad discretion in choosing whether to admit evidence" on a motion for summary judgment.) Indeed, the purpose of summary judgment is to allow courts to "pierc[e] the pleadings" and access admissible evidence to "determine whether there are genuine issues to be tried." *Lemelson v. Carolina Enters. Inc.,* 541 F. Supp. 645, 648 (S.D.N.Y. 1982).

Rather than strike a declaration because it contains hearsay, argument, or statements unsupported by citations to the record, courts considering a motion for summary judgment are free to disregard the improper portions, independently review the record, and consider only that which is admissible. *See New York v. Solvent Chem. Co.*, 218 F. Supp. 2d 319, 331 (W.D.N.Y. 2002); *Gasser v. Infanti Intern Inc.*, No. 03 CV 6413 (ILG), 2008 WL 2876531, at *7 (E.D.N.Y. July 23, 2008); *Russo v. Estee Lauder Corp.*, 856 F. Supp. 2d. 437, 443 (E.D.N.Y. 2012); *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003). Where declarations have been stricken, they

have "more resembled an adversarial memorandum than a bona fide affidavit," an affidavit "riddled with inadmissible" material. *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999); *see also Degelman Indus., Ltd.* v. *Pro-Tech Welding and Fabrication, Inc.,* No. 06-CV-6346, 2011 WL 6754053  (W.D.N.Y. May 31, 2011).

      **2.  Analysis**

Here, Plaintiff's declaration in support of her Motion for Partial Summary Judgment is not so riddled with inadmissible material that this Court cannot simply disregard any improper statements or unsupported portions. Plaintiff's declaration contains only 44 paragraphs, most of which Defendant does not dispute. Nor does Defendant take issue with 11 of the 15 exhibits attached to the declaration, three of which contain the deposition testimony of Southard's treating physicians (Dosluoglu, Lall, and Khan). Further, this Court has not relied on the four exhibits to which Defendant objects, because they are not necessary to resolve Plaintiff's motion. Defendant's Motion to Strike is therefore denied.

**C.**     **Plaintiff's Motion for Partial Summary Judgment**

      **1.**    **Standards of Law**

          **a.**    **Summary Judgment**

Although New York law governs Plaintiff's substantive claims, "federal law governs the burdens that the parties must meet at the summary judgment stage." *Zeak v. United States*, No. 11 Civ. 4253 (KPF), 2014 WL 5324319, *8 (S.D.N.Y. Oct. 20, 2014). "The respective burdens that the parties bear in a summary judgment motion are procedural rather than substantive and are thus subject to federal rather than state law." *Doona v. OneSource Holdings, Inc.,* 680 F. Supp. 2d 394, 396 (E.D.N.Y. 2010).

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the exacting burden of establishing the absence of any genuine issue of material fact. *FDIC v. Great Am. Ins. Co.* 607 F.3d. 288, 292 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "The party moving for summary judgment must show the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn a moving party cannot obtain a summary judgment." *Maple Grove Corp. v. Colony Ins. Co.,* No. 10-CV-942S(F), 2012 WL 4049618, at *3 (W.D.N.Y. Aug. 15, 2012) (citing *Celotex,* 477 U.S. at 322); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding whether to grant summary judgment "the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party." *Virgil v. Darlak*, No. 10-CV-6479P, 2013 WL 4015368, *3 (W.D.N.Y. Aug. 6, 2013) (citing *Anderson*, 477 U.S. at 248-49); *see also Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991). "A fact is 'material' only if it has some effect on the outcome of the suit." *Id*. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d. 92, 97 (2d Cir. 2000). As articulated by the Second Circuit:

> [T]he trial court's task at the summary judgment stage is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined to issue-finding; it does not extend to issue-resolution and only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv. Ltd. P'ship*, 22 F. 3d 1219, 1224 (2d Cir. 1994).

After a "party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the non-moving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Maple Grove*, 2012 WL 4049618, at *4 (citing *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d. 14, 18 (2d Cir. 1995)).

### b. FTCA

The FTCA authorizes "claims against the United States, for money damages for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346 (b)(1). Under the FTCA, courts are bound to apply the "law of the place where the act or omission occurred." 28 U.S.C. §1346 (b)(1); *Makarova v. United States*, 201 F. 3d. 110, 114 (2d Cir. 2000). This Court will therefore apply New York Law to Plaintiff's claims, because it is undisputed that Southard's injury and death occurred in New York.

### c.     New York Wrongful Death and Medical Malpractice

Section 5-4.1 of the New York Estates Powers and Trusts Law "provides that a personal representative of a decedent may maintain a wrongful death action provided the defendant would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." *Lamarca v. United States*, 31 F. Supp. 2d 110, 124 (internal quotations omitted). This means "that no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort." *Id.* (quoting *Dundon v. United States*, 559 F. Supp. 469, 475-76 (E.D.N.Y. 1983)). When a wrongful death action is premised on a defendant's alleged medical malpractice, the body of law surrounding medical malpractice and its attendant conclusions applies to the claim of wrongful death. *See Matos v. B. Khan*, 991, N.Y.S.2d 83 (2014); *see also Roques v. H. Noble, M.D.*, 899 N.Y.S. 2d 193 (2010).

To establish a claim of "medical malpractice under New York law, a plaintiff, must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (citing *Arkin v. Gittleson,* 32 F.3d 658, 664 (2d Cir. 1994) (citing New York cases)). A plaintiff must prove the claim by a preponderance of the credible evidence. *Ingersoll v. Liberty Bank of Buffalo*, 278 N.Y. 1,7,14 (1938).

To prove a breach occurred under the first prong, "the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards." *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987).  New York requires physicians to possess "the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices,"

"to exercise ordinary and reasonable care," *id.,* not "extraordinary knowledge and ability that belongs to a few doctors of exceptional ability." *Perez v. United States*, 85 F. Supp. 2d 220, 221 (S.D.N.Y. 1999). Even those physicians that comply with accepted standards of medical practice are "not required to achieve success in every case." *Schrempf v. State*, 66 N.Y.2d 289, 295, 496 N.Y.S.2d 973, 487 N.E. 2d 883 (1985). Indeed, the "mere fact that a medical procedure was unsuccessful, or had an unfortunate effect, will not support a claim that negligence had occurred." *Jimerson v. United States,* No. 99-CV-0954 (SR), 2003 WL 251950, at *1 (quoting *Perez*, 85 F. Supp. 2d at 227); see *Nestorowich v. Ricotta*, 97 N.Y.2d 393, 398 (2002) ("Not every instance of failed treatment … may be attributed to a doctor's failure to exercise due care.")

New York law also provides that "except as to matters within the ordinary experience and knowledge of laymen ... expert medical opinion evidence is required" to make out both of the elements of a medical-malpractice claim. *Milano*, 64 F.3d at 91 (quoting *Fiore v. Galang*, 64 N.Y.2d 999, 1001 (1985)); see *Kerker v. Hurwitz*, 558 N.Y.S.2d 388, 390 (1990). "The requirement that the plaintiff introduce expert medical testimony is imposed in part because without expert assistance a jury will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine." *Sitts,* 811 F.2d at 740 (internal quotations omitted).

New York cases not requiring expert medical opinion include "clear and obvious" deviations from accepted standards of medical practice, such as "where a dentist has pulled the wrong tooth," "an unexplained injury has occurred to a part of the body remote from the site of the surgery," or "where there is injury to a part of the body not

10

within the operative field." *Id.* (internal quotation marks and citations omitted). Where a medical-malpractice case is not "factually simple," expert testimony is indeed required. *Kambat v. St. Francis Hosp.*, 89 N.Y.2d 489, 496 (1997*); see also States v. Lourdes Hosp.*, 100 N.Y.2d 208 (2003). "The medical malpractice case in which no expert medical testimony is required is "rare." *Virgil*, 2013 WL 4015368, at *8 (citing *Sitts*, 811 F. 2d at 740) (internal quotations omitted).

### d.   *Res Ipsa Loquitur*

*Res ipsa loquitur*, an evidentiary doctrine "of ancient origin, derives from the understanding that some events ordinarily do not occur in the absence of negligence." *Id.* at 211 (internal citations omitted). The doctrine allows for the inference of negligence and may be relied upon where direct evidence is lacking to prove the claim or when "the actual or specific cause of an accident is unknown." *James v. Wormuth*, 21 N.Y.3d 540, 546 (2013) (quoting *Kambat*, 89 N.Y.2d at 494).

To establish a prima facie case of negligence under *res ipsa loquitur,* a "plaintiff must establish three elements: (1) the event must be of a kind that ordinarily does not occur in the absence of negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." *Id.* (internal quotations omitted). In a medical-malpractice case that is not factually simple and requires expert testimony, expert opinion "may be properly used" to satisfy "the first of the three required elements." *States,* 100 N.Y.2d at 212, 213. ("As advantageous as the *res ipsa loquitur* inference is for a plaintiff unable to adduce direct evidence of negligence, application of the doctrine does not relieve a plaintiff of the burden of

11

proof.") Expert testimony is necessary to help "bridge the gap" between the common knowledge of a jury "which does not encompass the specialized knowledge and experience necessary to reach a conclusion that the occurrence would not normally take place in the absence of negligence," and the knowledge of a qualified expert, which does. *Id.* at 212. "New York courts apply *res ipsa loquitur* sparingly [to medical-malpractice claims] because much of the medical treatment rendered to patients involves inherent risks which, even with adherence to the appropriate standard of care, cannot be eliminated." *Kennedy v. New York Presbyterian Hosp.*, No. 09 Civ. 6256 (RMB), 2011 WL 2847839, at *3 (S.D.N.Y. July 6, 2011) (internal quotations omitted).

### e. Treating Physicians as Expert Witnesses

It is well settled that under Rule 26 (a)(2)(B) of the FRCP, "a treating physician can provide expert testimony in a deposition or at trial without having submitted a written report." *Spencer v. Int'l Shoppes, Inc.*, No. CV 06-2637 (AKT), 2011 WL 4383046, at *2 (E.D.N.Y. Sept. 20, 2011); *see Franz v. New England Disposal Techs, Inc.,* No. 10-CV-201A (Sr), 2011 WL 5443856 (W.D.N.Y. Nov. 9, 2011). A review of Second Circuit jurisprudence indeed illustrates that "a treating physician fits the definition of an expert who may give opinion testimony under Federal Rule of Evidence 702, but … need not be explicitly designated as an expert witness under the Federal Rules of Civil Procedure [Rule 26]." *Barack v. Am. Honda Motor Co., Inc.*, 293 F.R.D. 106, 107 (D. Conn. 2013); *Brusso v. Imbeault,* 699 F. Supp. 2d 567, 578-579 (W.D.N.Y. 2010) (A treating physician may offer expert opinion testimony without having submitted a written report under Rule 26 if the physician is not otherwise a "witness retained or specially employed to provide expert testimony.")

But "without properly declaring a treating physician as an expert witness, the physician's testimony is limited to certain parameters." *Motta v. First Unum Life Ins. Co.*, No. CV 09-3674 (JS) (AKT), 2011 WL 4374544, at *3 (E.D.N.Y. Sept. 19, 2011). "[A] treating physician... who has not complied with the reporting requirement of Rule 26(a)(2)(B) ... should not be permitted to render opinions outside the course of treatment and beyond a reasonable reading of the medical records." *Lamere v. N.Y. State Office for the Aging*, 223 F.R.D. 85, 89 (N.D.N.Y. 2004). "A treating physician who was not designated as an expert witness and failed to prepare the necessary expert report is prohibited from testifying 'concerning opinions not gleaned from his own diagnosis and treatment of the plaintiff.'" *Barack*, 293 F.R.D. at 109 (quoting *Franz*, 2011 WL 5443856, at *3). Without a report, a treating physician can testify from "the physician's personal knowledge of the examination, diagnosis, and treatment of a patient," *Brundidge v. City of Buffalo*, 79 F. Supp.2d 219, 224 (W.D.N.Y. 1999), "not from information acquired from outside sources." *Mangla v. Univ. of Rochester*, 168 F.R.D. 137, 139 (W.D.N.Y. 1996); *see also Rafferty v. Erhard*, No. 09CV1019, 2012 WL 2577473 (W.D.N.Y. July 3, 2012).

Courts in this Circuit have regularly held that "treating physicians may testify as to opinions formed during their treatment … without the obligation to submit an expert report." *Williams v. Regus Mgmt. Group*, No. 10 Civ. 8987, 2012 WL 1711378, at *3 (S.D.N.Y. May 11, 2012) (quoting *Manganiello v. Agostini,* 07-CV-3644 (HB), 2008 WL 5159776, at *12 (S.D.N.Y. Dec. 9, 2008)) (citing cases); *see Motta*, 2011 WL 4374544, at *3 (Treating physicians, who have not submitted expert reports, "cannot be limited to solely factual testimony.") Their testimony may include opinions formed during treatment

in several areas, including "causation, severity, disability, permanency and future impairments," *id.,* "diagnosis" and "prognosis," *Spencer*, 2011 WL 4383046, at *4, as well as whether a breach of protocol occurred during their patient's course of treatment. *McFarland v. United States*, No. 12-CV-5162 (SJF)(SIL), 2014 WL 6389589, at *6 (E.D.N.Y. Nov. 14, 2014) (in granting summary judgment in a medical-malpractice case requiring expert opinion, court relied on deposition testimony of treating physician concerning whether a "deviation from the standard of care [occurred] during plaintiff's treatment," where treating physician did not submit an expert report).

A treating physician may indeed render "expert opinion testimony… without submitting a detailed report," as required from other experts, under Rule 26, but the testimony is limited to the scope of "information… acquired in his role as a treating physician." *Smolowitz v. Sherwin-Williams Co.,* No. 02 Civ. 5940, 2008 WL 4862981, at *4 (E.D.N.Y. Nov. 10, 2008); *see Romanelli v. Long Island R.R. Co.,* 898 F. Supp. 2d 626 (S.D.N.Y. 2012); *see also Kaufman v. Columbia Mem'l Hosp.*, No. 1:11-CV-667 (MAD/CFH), 2014 WL 3888229 (N.D.N.Y. Aug. 7, 2014). Where a "physician's testimony relies upon 'scientific, technical, or other specialized knowledge,' or facts and evidence outside the scope of treatment, the testimony is governed by Federal Rule of Evidence 702, requiring expert disclosure under Federal Rule of Civil Procedure 26." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, Docket No. 21-mc-102, Nos. 09-cv-00680, 06-cv-5285, 06-cv-1521, 07-cv-11291, 06-cv-1520,  2014 WL 5757713, at *4 (S.D.N.Y. Nov. 5, 2014) (quoting *Lamere*, 2004 WL 1592669, at *2).

**2. Analysis**

    **a.    A genuine issue of material fact exists as to whether occlusion of Southard's renal arteries occurred as a result of operator error during the EVAR procedure.**

This case involves a complicated medical procedure that called for the repair of Southard's abdominal aortic aneurysm by placing a stent graft within three millimeters of Southard's lowest renal artery. The medical procedure is not of the type that a lay trier of fact could reasonably be expected, without assistance, to know "what the accepted standards of practice were and that the defendant deviated from those standards." *See Sitts*, 811 F.2d at 739-740 (internal quotations omitted). Expert medical testimony is therefore necessary to support Plaintiff's medical-malpractice claim. *States*, 100 N.Y.2d at 210 (2003) (quoting *Kambat*, 89 N.Y.2d at 496) (noting that in only a "narrow category of simple medical malpractice cases" is expert testimony unnecessary).

    To satisfy her burden, Plaintiff has submitted the deposition testimony of Southard's three treating physicians, including Dr. Khan, who actually deployed the Zenith Stent Graft during Southard's EVAR procedure. Plaintiff seeks to use the treating physicians' deposition testimony to establish that coverage of Southard's renal arteries during the EVAR constituted a deviation from EVAR standards, and to establish causation, without having declared the doctors as experts or having submitted written reports from them. While this Court finds that the treating physicians' testimony arises out of their treatment of Southard and is therefore admissible, it nonetheless raises genuine issues of material fact regarding causation and whether a breach of standards occurred during Southard's EVAR procedure, specifically whether operator error caused the coverage of Southard's renal arteries.

Defendant does not dispute that Southard's renal arteries were occluded or blocked by the Zenith Stent Graft during the EVAR procedure or that Dr. Khan agreed with Plaintiff's attorney at his deposition that "coverage of both of the renal arteries … constitute[d] a deviation from good and accepted medical practice" and was not "an appropriate thing to happen" during Southard's EVAR procedure. (Docket No. 33-2 at 44; Docket No. 23-2 at 131; Docket No. 27 at 2). This testimony, however, fails to prove that Defendant breached EVAR standards or the standards of care in the community during Southard's procedure.  The issue is not whether the EVAR procedure resulted in an "unfortunate effect," but whether the "unfortunate effect"—the coverage of Southard's renal arteries by the Zenith Stent Graft during Southard's EVAR surgery—occurred as a *result* of a breach of standards of care in the community for that procedure or in this case, operator error, as Plaintiff purports. *Jimerson*, 2003 WL 251950, at *1.

The record reveals that all three of Southard's treating physicians opined on the cause of the Zenith Stent Graft's occlusion of Southard's renal arteries during the EVAR operation.  Although Dr. Lall testified that "operator error was perhaps [the] number one" reason why the Zenith Stent Graft ended up in the wrong spot on Southard's anatomy (Docket No. 23-2 at 181), all three physicians testified that it may have moved for other reasons.  Dr. Lall testified that the "device itself" may have "jump[ed] forward" because of "torque energy" during deployment. (Docket No. 39-1 at 12).  Dr. Dosluoglu testified that "friction" during "insertion" may also have "moved the [Zenith Stent] [G]raft up after correct deployment." (Docket No. 39-1 at 3, 5). Dr. Khan opined that "during the deployment the [Zenith Stent] [G]raft itself moved or got pushed by aortic pulsations." (Docket No. 33-2 at 48).  Based on this testimony, a genuine issue

16

of material fact therefore exists concerning whether the occlusion of Southard's renal arteries occured as a result of operator error during the EVAR procedure. Summary judgment is therefore precluded.

### b. A genuine issue of material fact exists concerning whether the failure to perform a confirming angiogram deviated from the standard of care in the community.

Plaintiff argues that the "Defendant was negligent not only because Mr. Southard's renal arteries were both covered, but also because the stent was deployed without first checking its position through angiogram." (Docket No. 41 at 2). Plaintiff claims that a "confirming angiogram ... would have caught the mal-positioning of the Zenith stent" before its final deployment. (Docket No. 41 at 3). In his testimony, Dr. Khan described his plan for the procedure:

> My plan was to do an angiogram in magnified views and in angles so that I can identify in the best possible way the origins of each renal artery, mark them on the screen, and then once I'm ready to go in with the device and it's in position, prior to deployment of the device or start of deployment of the device, check *another angiogram* to make sure the marks on the screen are exactly where I wanted them to be, and then that's followed by deployment of the device.

(Docket No. 23-2 at 125, (emphasis added)). Dr. Lall testified that "another angiogram" before or at the start of deployment of the Zenith Stent Graft was not conducted during Southard's EVAR procedure. (Docket No. 23-2 at 164.) Both Drs. Khan and Lall, however, testified that they did not deviate from protocol during Southard's EVAR procedure.

When asked how Southard's renal arteries were inadvertently covered, during his deposition, Dr. Khan replied: "[A]ll the steps that we take into account were taken into

account and still this thing happened of his renal artery … coverage. " (Docket No. 33-2 at 45). When asked: "[T]o what did you attribute the inadvertent coverage of the renal arteries?" Dr. Khan replied:  "Quite honestly, never figured it out, like what exactly happened, like why it happened, because … we did everything the way it was supposed to do, and we did it, and still it happened. So I don't know what actually went wrong." (Docket No. 33-2 at 47).

Dr. Lall was also questioned regarding whether Dr. Khan followed protocol during Southard's EVAR procedure:

> Q. Was there any time during the procedure that you felt that you had to alter Dr. Kahn's procedure?
>
> A. No.
>
> Q. Okay. Any time where you felt during the procedure that you needed to correct something that he was going to do?
>
> A. Not until after everything was done and we realized what the problem was.
>
> Q. As far as you were concerned, he hadn't done anything wrong from your observation … during the surgery until you realized that the renal arteries had been covered?
>
> A. Correct.

(Docket No. 23-2 at 174).

Treating physicians who have not submitted written reports pursuant to Rule 26 can provide expert opinion testimony regarding their care and treatment of the plaintiff, including whether they followed their own surgical protocols. On this point, Southard's treating physicians present differing testimony regarding whether they deviated from their EVAR protocol. Dr. Khan testified that conducting a confirming angiogram was his plan; Dr. Lall testified that a confirming angiogram was not performed. But both Drs. Lall

18

and Khan testified that they followed their protocols during Southard's EVAR.

Nonetheless, Plaintiff must do more than establish a breach of the EVAR protocols. She must establish a breach of the standards of care in the community. Whether accepted standards of care in the community require performance of a confirming angiogram during Southard's EVAR procedure is an issue that requires expert testimony. As discussed above, the undisclosed treating physicians cannot offer this expert testimony because their testimony is limited to their treatment of Southard and opinions arising out of and related to that treatment. In the absence of expert testimony concerning the standards of care in the community, and whether the treating physicians violated those standards, summary judgment in Plaintiff's favor cannot be granted.[2]

### c. Plaintiff is not entitled to summary judgment under a *res ipsa loquitur* theory.

Plaintiff contends that *res ipsa loquitur* applies to her medical-malpractice claim. Plaintiff lacks direct evidence to support her claim, and the deposition testimony suggests that the cause of the Zenith Stent Graft's coverage of Southard's renal arteries during the EVAR is ultimately "unknown." *James*, 21 N.Y. 3d at 546.

As discussed above, however, material issues of fact exist regarding whether the events that led to Southard's injuries and death could occur in the absence of negligence. *See id.* Moreover, Plaintiff has failed, at this point, to present expert testimony concerning the standards of care in the community and whether the treating physicians breached those standards, which will be necessary for Plaintiff to prove that

---

[2] This Court notes that the expert disclosure deadlines in the case-management order have been stayed pending resolution of this motion. Accordingly, Plaintiff still has the opportunity to retain and disclose relevant experts. *See* Docket No. 42.

Southard's injuries could not have occurred in the absence of negligence. *Cf. Morejon v. Rais Const. Co.*, 7 N.Y.3d 203, 208, 212 (2006) ("[O]nly in the rarest of *res ipsa loquitur* cases may a plaintiff win summary judgment," namely a case where there are "no facts . . . left for determination" and "the inference of defendant's negligence is inescapable.")

Accordingly, Plaintiff has not demonstrated her entitlement to summary judgment on this theory.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion to Strike are denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Partial Summary Judgment (Docket No. 23) is DENIED.

FURTHER, that Defendant's Motion to Strike (Docket No. 25) is DENIED.

SO ORDERED.

Dated:   September 28, 2015
         Buffalo, New York

                               /s/William M. Skretny
                              WILLIAM M. SKRETNY
                              United States District Judge