UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

WILMA COOLIDGE as Executor of the Estate of
Howard Southard, Deceased,

                              Plaintiff,

        v.                                                  **DECISION AND ORDER**
                                                            10-CV-363S
UNITED STATES OF AMERICA,

                              Defendant.

# I.    INTRODUCTION

        Wilma Coolidge commenced this action pursuant to the Federal Tort Claims Act,

28 U.S.C. §§ 1346 and 2671, et seq. ("FTCA") and New York law seeking damages

from the United States (the "Government") for injuries leading to the death of Howard

Southard ("Mr. Southard") sustained while in the care of medical professionals working

at a hospital administered by the United States Department of Veterans Affairs ("VA").

Plaintiff (Mr. Southard's sister) alleges medical malpractice and wrongful death.  The

case was tried over seventeen days from January 26 to November 14, 2018.  Parties

then submitted proposed Findings of Fact and Conclusions of Law and written

summations (Docket Nos. 212, 205, 200, 218 (plaintiff's post-trial submissions);

Nos. 215, 195, 196, 216 (defendant Government's post-trial submissions)).

        Having considered the evidence admitted at trial, assessed the credibility of the

witnesses, and reviewed the post-trial submissions of the parties, this Court makes the

following findings of fact and conclusions of law pursuant to Rule 52 of the Federal

Rules of Civil Procedure[1] ("Rule 52") and ultimately concludes for the reasons set forth

_____

        [1]Rule 52 provides, in relevant part, that following a bench trial, "the court must find the facts

below, that Plaintiff has **proved** that Defendant is liable for Mr. Southard's injuries and death.

## II.    LEGAL STANDARDS

A.  Federal Tort Claims Act

Under the FTCA, the United States is liable in the same manner as a private person for the tortious acts or omissions of its employees acting within the scope of their employment "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); see also Molzof v. United States, 502 U.S. 301, 305 (1992) ("the extent of the United States' liability under the FTCA is generally determined by reference to state law") (citations omitted).  Accordingly, a federal court presiding over an FTCA claim must apply "the whole law of the State where the act or omission occurred."  Richards v. United States, 369 U.S. 1, 11 (1962); see also Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) ("State law applies to an FTCA claim").  The substantive law of New York applies for determining claims for wrongful death or medical malpractice under the FTCA, Makarova v. United States, 210 F.3d 110, 114 (2d Cir. 2000); Jimerson v. United States, No. 99CV954E, 2003 WL 251950, at *1 (W.D.N.Y. Jan. 13, 2003) (Elfvin, J.).

Section 5-4.1 of the New York Estates, Powers and Trusts Law provides that "a personal representative of a decedent may maintain a wrongful death action provided the defendant would have been liable to the decedent by reason of such wrongful conduct if death had not ensued," LaMarca v. United States, 31 F. Supp. 2d 110, 124 (E.D.N.Y. 1998) (internal quotations omitted) (Docket No. 196, Gov't Proposed

---

specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).

Conclusions of Law ¶ 79).  This means "'that no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort.'"  Id. (quoting Dundon v. U.S., 559 F. Supp. 469, 475-76 (E.D.N.Y. 1983)).

B.  Medical Malpractice under New York Law

When a wrongful death action is premised on a defendant's alleged medical malpractice, the body of law surrounding medical malpractice and its attendant conclusions applies to the claim of wrongful death.  See Matos v. Khan, 119 A.D.3d 909, 910-11, 991 N.Y.S.2d 83, 84-85 (2d Dep't 2014).

To establish a medical malpractice claim under New York law, a plaintiff must prove by a preponderance of the evidence:  "(1) the standard of care in the locality where the treatment occurred; (2) that the defendant breached that standard of care; and (3) that the breach of the standard was the proximate cause of injury."  See, e.g., Milano by Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995); Berger v. Becker, 272 A.D.2d 565, 565, 709 N.Y.S.2d 418 (2d Dep't 2000); see generally 1B N.Y. Pattern Jury Instructions:  Civil 2:150 (3d ed. 2020) (hereinafter "N.Y. PJI").  Under the first element, the general standard of care in New York requires a physician to exercise

"that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices. . .. The law holds [the physician] liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment."

United States v. Perez, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999) (quoting Pike v. Honsinger, 155 N.Y. 201, 49 N.E. 760 (1898)); see also Sitts v. United States, 811 F.2d 736, 739-40 (2d Cir. 1987).  New York law also requires a physician comply with the minimum national standards of care, 1B N.Y. PJI 2:150, at 45.  An error in medical

3

judgment by itself does not give rise to liability for malpractice, <u>Nestorowich v. Ricotta</u>, 97 N.Y.2d 393, 398-99, 740 N.Y.S.2d 668, 671-72 (2002).  Consequently, in order to prevail here, Plaintiff must have shown by the preponderance of the evidence that the medical professionals treating Mr. Southard failed to conform to accepted community standards of practice.  <u>Id.</u> at 398, 740 N.Y.S.2d at 671.  The "mere fact that a medical procedure was unsuccessful, or had an unfortunate effect, will not support a claim that negligence had occurred."  <u>Perez</u>, <u>supra</u>, 85 F. Supp. 2d at 227.  And not "every instance of failed treatment or diagnosis may be attributed to a doctor's failure to exercise due care." <u>Nestorowich</u>, <u>supra</u>. 97 N.Y.2d at 398, 740 N.Y.S. 2d at 671. Proving a claim for medical malpractice ordinarily requires expert testimony regarding both a departure from the standard of care and proximate causation.  <u>Kerker v. Hurwitz</u>, 163 A.D.2d 859, 558 N.Y.S.2d 388, 390 (4th Dep't 1990); <u>Milano</u>, <u>supra</u>, 64 F.3d at 91.

To establish a fact by a preponderance of the evidence, a plaintiff must "prove that the fact is more likely true than not true."  <u>See</u> <u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d Cir. 1997) (quotation and citation omitted).  Each element must be established by expert medical opinion unless the deviation from a proper standard of care is so obvious as to be within the understanding of an ordinary layperson. <u>See, e.g.</u>, <u>Sitts</u>, <u>supra</u>, 811 F.2d at 739-40 (noting that "in the view of the New York courts, the medical malpractice case in which no expert medical testimony is required is 'rare'") (citation omitted); <u>see also</u> <u>Fiore v. Galang</u>, 64 N.Y.2d 999, 1000-01, 489 N.Y.S.2d 47 (1985) ("except as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action, expert medical opinion evidence is required to demonstrate

merit"); Blake v. United States, No. 10CV610, 2017 U.S. Dist. LEXIS 58354, at *3-5 (W.D.N.Y. Apr. 17, 2017) (Skretny, J.).

      C.  Damages under the FTCA

      Any damages in a FTCA action are determined by the law of the state in which the tort occurred, Ulrich v. Veterans Admin. Hosp., 853 F.2d 1078, 1081-82 (2d Cir. 1988), here New York law.  "Once a plaintiff establishes negligence as the proximate cause of her injuries, she is entitled to recover 'a sum of money which will justly and fairly compensate ... [her] ... for the loss resulting from the injuries sustained.'  Robinson v. U.S., 330 F.Supp.2d 261, 290 (W.D.N.Y. 2004) [Curtin, J.] (quoting Kehrli v. City of Utica, 105 A.D.2d 1085, 1085, 482 N.Y.S.2d 189 (4th Dep't 1984))," Furey v. U.S., 458 F. Supp. 2d 48, 56 (N.D.N.Y. 2006).  Plaintiff seeks damages for injuries including pain and suffering, as well as compensation for Mr. Southard's wrongful death, medical bills, and funeral expenses.  There are no damages claimed for Mr. Southard's lost wages, as he was retired at the time of his death and did not anticipate returning to work.  There are also damages claimed on behalf of Mr. Southard's children as his distributees.

      D.  Wrongful Death

      To prevail as Mr. Southard's representative in this wrongful death action, Plaintiff has to establish

> "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent."

Garcia v. Dutchess County, 43 F. Supp. 3d 281, 298-99 (S.D.N.Y. 2014) (quoting

Hollman v. Taser Int'l Inc., 928 F. Supp. 2d 657, 683 (E.D.N.Y. 2013)) (Docket No. 191,

Gov't Memo. at 3).  New York law limits recovery in wrongful death to fair and just

compensation for pecuniary injuries that result from the death, 1B N.Y. PJI 2:320, at

1030; N.Y. Est. Powers & Trusts L. § 5-4.3 (id.).  As the Government notes, "thus,

damages recoverable in a wrongful death action are limited to compensation for the

pecuniary injuries resulting from the decedent's death to the persons for whose benefit

the action is brought" (id., citing N.Y. Est. Powers & Trust L. § 5-4.3(a)).

"[T]he essence of the cause of action for wrongful death in this State is that the

plaintiff's reasonable expectancy of future assistance or support by the decedent was

frustrated by the decedent's death." Gonzalez v. New York City Hous. Auth., 77 N.Y.2d

663, 668, 569 N.Y.S.2d 915, 918 (1991); see also In re Air Crash Near Clarence Ctr.,

N.Y., 983 F. Supp. 2d 249, 252-53 (W.D.N.Y. 2013) (Skretny, C.J.).  Recognized

pecuniary injuries under New York law include loss of support, voluntary assistance and

possible inheritance by decedents, medical and funeral expenses incidental to death,

Parilis v. Feinstein, 49 N.Y.2d 984, 985, 429 N.Y.S.2d 165, 166 (1980); Gonzalez, supra,

77 N.Y.2d 663, 569 N.Y.S.2d 915 (Docket No. 191, Gov't Memo. at 4).  These damages

do not include those "which could have been recovered in a personal injury action had

the decedent survived," Parilis, supra, 49 N.Y.2d at 985, 429 N.Y.S.2d at 166; Liff v.

Schildkrout, 49 N.Y.2d 622, 633, 427 N.Y.S.2d 746, 749 (1980).  As the New York Court

of Appeals held, "the wrongful death statute created a new cause of action based not

upon damage to the estate of the deceased because of death, but rather for the pecuniary

injury to the surviving spouse and next of kin of the decedent," Liff, supra, 49 N.Y.2d at

6

632-33, 427 N.Y.S.2d at 749; a decedent thus "has not cause of action to recover damages for his death (EPTL 11-3.3)," id.

Children (including adult children) of a deceased parent may "recover for the pecuniary loss suffered as a result of the lost nurture, care, and guidance they would have received if the parent had lived," McKee v. Colt Electronics Co., Inc., 849 F.2d 46, 52 (2d Cir. 1988) (applying New York law); Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 52 (2d Cir. 1984) (citing in turn Zaninovich v. American Airlines, Inc., 26 A.D.2d 155, 161, 271 N.Y.S.2d 866 (1st Dep't 1966)); Gonzalez, supra, 77 N.Y.2d 663, 569 N.Y.S.2d 915; see Woods v. Town of Tonawanda, No. 13CV798, 2020 WL 1703537, at *17 (W.D.N.Y. Apr. 8, 2020) (Skretny, J.).   Under New York law, factors consider in determining pecuniary damages for the wrongful death of a parent include, among others, the "the age, character, earning capacity, health, intelligence, and life expectancy of the decedent, as well as the degree of dependency of the distributees upon the decedent and the probable benefits they would have received but for the untimely death." McKee, supra, 849 F.2d at 52 (citations omitted) (see also Docket No. 191, Gov't Memo. at 4); see also Moldawsky v. Simmons Airlines, Inc., 14 F. Supp. 2d 533, 535 (S.D.N.Y. 1998).   Courts also consider the number and age of children, Collado v. City of N.Y., 396 F. Supp. 3d 265, 281 (S.D.N.Y. 2019) (citing cases).

Adulthood support usually is less than what would be allowed for children in their infancy given an infant's greater dependence on parents for guidance and material support during that stage of life, Mono v. Peter Pan Bus Lines, Inc., 13 F. Supp. 2d 471, 477 (S.D.N.Y. 1998) (awards to adult children generally are a fraction of the amount awarded to infant children, citing New York State cases); see Moldawsky, supra, 14 F.

Supp. 2d at 535.  Courts focus damages during the children's developmental period and dependence, McKee, supra, 849 F.2d at 50.  As noted in Moldawsky, "two factors tend to reduce such awards as the children grow older:  they have less need for such guidance, and the life expectancy of the parent who would furnish it becomes shorter," 14 F. Supp. 2d at 535.

One federal court called this concept of pecuniary loss "nebulous," characterizing it as the loss of training and education the decedent would have provided his children even into adulthood, Dershowitz v. U.S., No. 12-CV-08634, 2015 WL 1573321, at *36 (S.D.N.Y. Apr. 8, 2015) (quotations and citations, including McKee, omitted); see also Shu-Tao Lin, supra, 742 F.2d at 52 ("Assessing the pecuniary value of such loss is of course problematic," citing New York cases apparently fashioning "somewhat arbitrary amounts in doing so," id.).  "The key requirement for recovery is proof of pecuniary loss," Dershowitz, supra, 2015 WL 1573321, at *37 (emphasis in original).  This compensation, however, must be reasonable for the loss of parental guidance from the death of decedent until the date of verdict, Hyung Kee Lee v. New York Hosp. Queens, 118 A.D.3d 750, 755, 987 N.Y.S.2d 436, 442 (2d Dep't 2014) (citing cases).

Children also cannot recover for their pain or grief, see LaMarca, supra, 31 F. Supp. 2d at 130; Bumpurs v. New York City Hous. Auth., 139 A.D.2d 438, 439, 527 N.Y.S.2d 217, 218 (1st Dep't 1988); cf. N.Y. PJI 2.320; 1B N.Y. PJI 3d 2:320, at 1030-31, but could recover for the loss of guidance from their parent as well as the loss of any monetary gifts he or she might have given them.

### III.   Prior Proceedings

Plaintiff alleged in the First Cause of Action negligence in Mr. Southard's care.

(Docket No. 1, Compl. ¶¶ 12-15.)  As summarized in a Decision and Order on plaintiff's

motion for summary judgment (Docket No. 43, Decision and Order of Sept. 29, 2015,

2015 U.S. Dist. LEXIS 131583), plaintiff alleged that the Government,

> "by its employees, agents and representatives, 'carelessly and negligently
> rendered medical care and treatment to the plaintiff's decedent which was
> not in accordance with good and acceptable medical and surgical practice'
> and 'as a direct and proximate cause of the negligence of defendant, the
> plaintiff's decedent . . . suffered severe, permanent and painful injuries,
> including conscious pain and suffering, ultimately resulting in his death,"

(id., 2015 U.S. Dist. LEXIS 131583, at *4-5 (quoting Docket No. 1, Compl.¶¶ 12-13).  In

the Second Cause of Action, plaintiff alleged that the Government did not obtain

informed consent from Mr. Southard (Docket No. 1, Compl. ¶¶ 17-19); this Court later

dismissed that cause of action (Docket No. 115, Order of Oct. 4, 2017, at 4).  In the

Third Cause of Action, plaintiff claimed that the injuries, conditions, and damages

sustained by Mr. Southard were caused by the Government's negligence and, as a

result, Mr. Southard's survivors and those entitled to inherit from his estate "have been

deprived of the direction, guidance, and financial assistance of" Southard, entitling them

to compensation for such items as his wrongful death, medical bills and expenses,

funeral expenses, and "for income and services" (Docket No. 1, Compl. ¶¶ 21-23).

Plaintiff seeks $13,000,000 plus interest in damages (id. at unnumbered page 4,

"WHEREFORE" Cl.).  The Government duly answered (Docket No. 2).

Plaintiff later moved for partial summary judgment on liability (Docket No. 23) and

this Court denied that motion holding that genuine issues of fact existed whether the

occlusion of Mr. Southard's renal arteries occurred as result of operator error during the

endovascular abdominal aortic aneurysm repair ("EVAR"), whether the failure to perform a confirming angiogram deviated from the standard of care in the community, and whether Mr. Southard's injuries and death could have occurred in the absence of negligence (Docket No. 43, Decision and Order of Sept. 29, 2015), Coolidge v. United States, 2015 U.S. Dist. LEXIS 131583, at *18-25.

A bench trial began in January 26, 2018, with opening statements (Docket No. 124) and continued for seventeen non-consecutive days of testimony until the Government rested on November 14, 2018 (Docket Nos. 178, 182).  Below is a table of trial dates, listing who testified (either as a live witness, by video conference, or by read deposition transcripts), with citations to the transcription and minute entries on the docket for each trial day.

| Date | Event | Transcript Docket Nos. | Minute Entry Doc. No. |
|---|---|---|---|
| Jan. 26, 2018 | Opening Statements | | 124 |
| Feb. 8, 2018 | Plaintiff's proof, Dr. Hasan Dosluoglu | 146 | 128 |
| Feb. 9, 2018 | Dr. Dosluoglu | 147 | 129 |
| Mar. 8, 2018 | Dr. Mark LeVaughn | 150 | 139 |
| Mar. 9, 2018 | Dr. LeVaughn; Plaintiff | 152 | 141 |
| Mar. 14, 2018 | Plaintiff, Clarence Holley (EBT Tr. read), Ella Clark (EBT Tr. read) | 153, 154 | 143 |
| Mar. 15, 2018 | Howard W. ("Sonny") Southard | 155 | 144 |
| Mar. 16, 2018 | Tona Williams | 156 | 145 |
| Mar. 26, 2018 | Dr. Dosluoglu continued | 151 | 148 |
| Mar. 29, 2018 | Dr. Purandath Lall (by video conference from Florida) | 157 | 149 |
| May 18, 2018 | Dr. LeVaughn continued | 162 | 158 |
| May 30, 2018 | Mohammad Usman Nasir Khan (EBT Tr. read) | 206 | 159 |
| June 5, 2018 | Khan continued (EBT Tr. read) | 207 | 161 |

| | | | |
|---|---|---|---|
| June 25, 2018 | Dr. Lall continued (by video conference from Florida) | 164 | 163 |
| Oct. 10, 2018 | Dr. Lall continued (by video conference from Florida) | 172 | 165 |
| Oct. 11, 2018 | Dr. Barton Muhs; PLAINTIFF RESTS | 169 | 166 |
| Nov. 14, 2018 | Defendant Government's proof, Dr. David Gillespie; DEFENSE RESTS | 182 | 178 |

The parties then submitted their written summations (Docket Nos. 212 (plaintiff), 215 (Government)), proposed Findings of Fact (Docket Nos. 205, 196 (plaintiff), 197 (Government)), Conclusions of Law (Docket Nos. 200 (plaintiff), 196 (Government)), and their respective responses to the proposed Conclusions of Law (Docket Nos. 219 (amended exhibits), 218, 213 (plaintiff), 216 (Government)).

## IV.   TRIAL TESTIMONY[2]

### A.  Background

Plaintiff was appointed executrix of the estate of her brother, Howard Southard, on or about December 4, 2009.  Mr. Southard underwent an EVAR at the Veterans Affairs Medical Center in Buffalo, New York, on April 1, 2009, having been referred by the Veterans Affairs Hospital in Bath, New York, Coolidge v. United States, No. 10CV363, Docket No. 43, 2015 U.S. Dist. LEXIS 131583, at *2 (W.D.N.Y. Sept. 28, 2015) (Skretny, J.).   The United States Department of Veterans Affairs operates the Department of Veterans Affairs Medical Center in Buffalo, New York ("VAMC").

---

[2]This Court describes only those issues that are material to the resolution of the parties' claims.  See Immigration & Naturalization Serv. v. Bagamasbad, 429 U.S. 24, 25 (1976) ("courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach"); Rule 52 Advisory Committee Notes (1946 Amendment) ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for overelaboration of detail or particularization of facts").

Eight fact witnesses testified at trial. Plaintiff testified as well as Southard's daughter, Tona Williams (hereinafter "Tona"); one of his sons, Howard Warren (also known as "Sonny") Southard; his late cousin, Clarence Holley (by deposition testimony); and another sister, Ella Clark (also by deposition testimony). The Government called Drs. Mohammed Khan (through his deposition), Purandath Lall, and Hasan Dosluoglu, the surgeons who operated on Mr. Southard, as witnesses. Expert witnesses also testified for both parties. Numerous exhibits were entered into evidence, consisting primarily of Mr. Southard's medical records, deposition transcripts, and curricula vitae of the medical witnesses.

As found in a Decision and Order of September 29, 2015, on Plaintiff's motion for partial summary judgment, Coolidge, supra, 2015 U.S. Dist. LEXIS 131583, at *2-4, and the record cites therein, Mr. Southard had functioning kidneys prior to the April operation. An EVAR which was performed on him is a "closed procedure," meaning that a stent graft is placed without making an open surgical incision at the site of the aneurysm. In Mr. Southard's case, surgeons inserted a stent graft endovascularly into his vascular system through his groin and passed it up to the portion of his aorta containing the aneurysm for deployment "within a millimeter or two or three maximum of the ['lowest'] renal artery." Three physicians were present during Mr. Southard's surgery. Dr. Purandath Lall, in 2009 the chief of vascular surgery at VAMC, was the attending supervising surgeon. Dr. Hasan H. Dosluoglu was the chief for the division of vascular surgery and chief of surgery and vascular surgery at the VAMC and was Mr. Southard's supplemental surgeon. Dr. Mohammad Usman Nasir Khan was a fellowship student in vascular surgery, working under Dr. Lall's supervision.

Drs. Lall and Khan performed the aneurysm repair surgery. According to both doctors, Mr. Southard was an excellent candidate for the closed procedure due to the anatomy of his aorta. Drs. Lall and Khan used a Cook Zenith Flex AAA endovascular stent graft ("Zenith Stent Graft" or "the stent graft") to perform the EVAR.

Dr. Khan deployed the Zenith Stent Graft under Dr. Lall's supervision. The EVAR, however, resulted in the Zenith Stent Graft covering both of Southard's renal arteries. A completion angiogram conducted after the Zenith Stent Graft was locked in place revealed that it had occluded blood flow to both renal arteries. All three surgeons then performed a series of unsuccessful operations attempting to reestablish blood flow to the kidneys. After the EVAR, Mr. Southard required kidney dialysis and remained hospitalized at the VA until his death in July 2009, four months after the surgery. Coolidge, supra, 2015 U.S. Dist. LEXIS 131583, at *2-4.

B. Fact Witnesses Testimony

1. Plaintiff, Wilma Coolidge

Testifying on March 9 and 14, 2018, Plaintiff Wilma Coolidge ("Plaintiff") first gave a brief biography of Mr. Southard; he was born in January 1945 and was 64 years old at his death (Docket No. 153[3], Pl. Tr. Mar. 14, 2018, at 3-4). While in the U.S. Army, Southard was stationed in Germany and he married his first wife, Birgitta, and had two sons, Howard William ("Howie") and Roy. Southard then divorced Birgitta. (Docket No. 152, Pl. Tr. Mar. 9, 2018, at 98-102.) Southard then married Roberta and had two more children, Sonny and Tona, but also divorced Roberta (id., Pl. Tr. at 102-03, 105).

---

[3]A duplicate of this transcript also was filed as Docket No. 154.

Southard then married and divorced two other women (id., Pl. Tr. at 106, 108-09, 119). Mr. Southard had no contact with any of his children during their childhood, re-connecting with Howie and Roy in their thirties (id., Pl. Tr. at 102, 105-06, 109-11) and with Sonny and Tona once they each turned 18 years old (id., Pl. Tr. at 115-16).

Southard's cousin, Clarence Holley, also testified that Southard once visited his sons in Germany, Southard had a good relationship with them, and was present when the sons called Southard. Holley did not know if Southard ever provided any financial support to his children (either the two German sons or his son and daughter in Pennsylvania). (Docket No. 153, Holley Tr. at 151-52.) Southard and Plaintiff's sister, Ella Clark, also testified that she never saw Southard's children except when Howie visited from Germany (Docket No. 153, Clark Tr. at 169-70) and did not know the extent of Southard's support to them (id., Clark Tr. at 170-71). Clark also did not know if Southard gave gifts or support to his adult children (id., Clark Tr. at 179).

Following his return from Germany and the Army, Mr. Southard was a long-haul trucker until he retired, driving for two- to three-week stints (Docket No. 152, Pl. Tr. at 100-01, 104). Plaintiff testified that she knew Southard gave his two sons in Germany one hundred dollars for Christmas (id., Pl. Tr. at 116-17) but Plaintiff did not know what he gave to Sonny or Tona (id., Pl. Tr. at 118). Southard was not earning any money in 2008-09, but he received Social Security (Docket No. 153, Holley Tr. at 153).

In 2009, Mr. Southard went to the Bath VA clinic for back pain (Docket No. 152, Pl. Tr. at 119). The clinic conducted scans of his back which revealed aortic aneurysm and the clinic recommended Southard come to Buffalo VAMC for EVAR procedure (id., Pl. Tr. at 119-20). Holley took Southard to the Buffalo VA Hospital on April 1, 2009

14

(Docket No. 153, Holley Tr. at 149, 153).  Their plan was for Holley to bring Southard

back home after the operation (id., Holley Tr. at 154; Docket No. 152, Pl. Tr. at 123), but

Holley was told that Southard was not returning home (Docket No. 153, Holley Tr. at

154).

      Plaintiff testified that the anesthesiologist later called her and said that "they

messed up" (Docket No. 152, Pl. Tr. at 123, 124-25), that stent grafts were placed in the

wrong place over his blood flow to his kidneys (id., Pl. Tr. at 125).  Later that evening,

one of the surgeons, Dr. Lall, called Plaintiff and she claimed said they messed up (id.,

Pl. Tr. at 126).  Plaintiff was called by the VAMC seeking permission to place Southard

on dialysis (id., Pl. Tr. at 127-28).

      Plaintiff visited Southard in VAMC on April 3, 2009, when Southard was in the

ICU and was not awake.  Southard did not respond to plaintiff.  (Docket No. 153, Pl. Tr.

at 8.)  Nurses told plaintiff that Mr. Southard was being kept comfortable (id.).  Holley

testified that he visited Southard within five to six days of April 1, 2009, but Southard

could not talk and was upset "because he couldn't talk," beating on the mattress and

handrail (Docket No. 153, Holley Tr. at 157-58).  Southard tried to mouth words, but

Holley did not understand (id., Holley Tr. at 158).   Holley testified that Southard also

appeared to be in pain, he would flinch and make faces without anyone performing a

procedure on him (id., Holley Tr. at 162).  Clark also saw Southard on other visits, and

he seemed drugged, but he could answer questions by nodding or shaking his head

(Docket No. 153, Clark Tr. at 181).  Clark believed Southard was in pain on every visit

because he was cringing, but she did not know what caused the cringing (id., Clark Tr.

at 173, 176, 177).

Plaintiff saw Mr. Southard again on April 5 or 6 and she believed that he was in pain because of his grimacing and tears (Docket No. 153, Pl. Tr. at 11, 12, 13, 88-89, 126-28).  Mr. Southard was given pain medication to keep him comfortable in April (id., Pl. Tr. at 6; Docket No. 152, Pl. Tr. at 155).  Mr. Southard appeared to be in pain; one instance Plaintiff requested additional pain medication for him, and the nurse refused to give it (Docket No. 152, Pl. Tr. at 160; Docket No. 153, Pl. Tr. at 89).  Plaintiff testified that nurses relied upon Mr. Southard's facial expressions or his mouthing words to interpret whether he was in pain when he could not otherwise express himself (Docket No. 153, Pl. Tr. at 130-31).

Plaintiff served as Mr. Southard's health care proxy until Tona Williams assumed that role (Docket No. 152, Pl. Tr. at 122, 170; Docket No. 153, Pl. Tr. at 89).  Plaintiff also served as Southard's power of attorney and managed his financial affairs while he was in the hospital (Docket No. 153, Pl. Tr. at 69).  During the period when Plaintiff had Southard's health care proxy, she received calls almost every day from the doctors at the VAMC asking permission to perform surgeries on Southard and she consented to all procedures, including a tracheostomy, central line, and a Perma-Cath (its installation and later removal) (Docket No. 152, Pl. Tr. at 129, 156, 168).

As Plaintiff visited Mr. Southard, she believed him to be frustrated because he could not communicate (id., Pl. Tr. at 158).  He would mouth words and, when she did not understand, he would get upset and pound his fist on the bed (id., Pl. Tr. at 158-59). She also believed him to be depressed, because he cried and "just lay there," and that he was in pain, because he grimaced when he tried to turn (id., Pl. Tr. at 159-60; Docket No. 153, Pl. Tr. at 162).  Southard sometimes nodded when she asked if he was in pain

(id., Pl. Tr. at 160, 162).  The nurses also told Plaintiff that Mr. Southard expressed pain and frustration by nodding his head (Docket No. 153, Pl. Tr. at 125).

In May, Plaintiff visited four or five times and she recalled that Southard was more alert and tried communicating more, but his facial expressions and movements suggested that he was in pain, including crying (id., Pl. Tr. at 11-12, 13, 23).  VAMC medical providers told Plaintiff that Southard said he was tired of the medical treatment and that he did not want to be on dialysis for the rest of his life (id. , Pl. Tr. at 12-13, 14). Plaintiff understood that someone was talking to Southard regarding his mental state and that he was on anti-depressants (id., Pl. Tr. at 21-22).

Plaintiff recalled visiting Southard in June with Tona, and that Tona was able to understand him better.  Southard told Tona that he wanted to be on dialysis and that he wanted to "stick around longer."  (Id., Pl. Tr. at 15.)  Mr. Southard was prescribed numerous medications and therapies in an effort to alleviate his extreme pain, anxiety, fear and terror (Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶ 313; Jt. Tr. Ex. 123, Southard medication log; Docket No. 153, Pl. Tr. at 57).  Plaintiff testified that she saw Southard's legs and buttocks and saw bedsores (pointed out by Tona) (Docket No. 153, Pl. Tr. at 24) but (when her memory was refreshed by her deposition testimony) she admitted to not seeing bedsores (id., Pl. Tr. at 102-03).  Plaintiff did see sores, blisters, and bandages on Southard's abdomen (id., Pl. Tr. at 24).  She said that the hospital room smelled like rot during dialysis and that it seemed like he was "rotting away" (id., Pl. Tr. at 25-26).  During Mr. Southard's hospitalization, he was unable to stand, walk or sit up (id., Pl. Tr. at 65).

Plaintiff attended a "family meeting" with the doctors to discuss treatment options around July 22, 2009 (id., Pl. Tr. at 40). The doctors told the family that that they did not think Mr. Southard would live much longer, that there was nothing else they could try, so they were going to unhook him (id., Pl. Tr. at 42-44, 45-46, 49). On cross-examination, Plaintiff said that Dr. Lall "pointed in the direction" of discontinuing treatment, but the family did have a choice (id., Pl. Tr. at 96-97).

After meeting separately from Mr. Southard, the family and medical team went into Southard's room and Plaintiff testified that medical staff unhooked the machines while informing Southard that he would die in a matter of days (id., Pl. Tr. at 52, 98-101). Plaintiff testified that Mr. Southard was scared, his eyes got big, and he cried (id., Pl. Tr. at 52-53). The doctors removed life support but kept him comfortable on pain medication. Plaintiff had time alone with Southard after and he said that the doctor had made a mistake and seemed scared and upset (id., Pl. Tr. at 52-53). On July 27, 2009, Tona reported that Mr. Southard had died (id., Pl. Tr. at 59).

As administratrix of Southard's estate, plaintiff paid for Southard's burial, totaling $6,073.64, part from her personal funds, part from the estate and the rest from Tona and Sonny (Id., Pl. Tr. at 64, 76-78). Southard named his four children as beneficiaries in his will, which he signed while in the hospital (id., Pl. Tr. at 64). Sonny and Tona were present while the last will was being discussed, and Southard nodded when the attorney asked if Southard wanted them to be beneficiaries. (Id., Pl. Tr. at 67-69.) Mr. Southard did not have to pay out of pocket for any medical care and received burial benefits from VA of $300 (id., Pl. Tr. at 77-78).

2.  Tona Williams

Tona Williams, Mr. Southard's daughter, testified on March 16, 2018 (Docket No. 156, Tr.).  Mr. Southard reconnected with Tona when she turned 18 (id., Tr. at 10, 16) after not being involved in her life during her childhood (id., Tr. at 126).  Tona met him between long hauls (id., Tr. at 11, 126-27).  After Tona bought a house, Mr. Southard advised her on carpentry but was not able to help with work around the house (id., Tr. at 24-25).  Through the years, Southard gave Tona gifts, items he collected on the road, but never gave her money (id., Tr. at 153).  He encouraged Tona to improve herself, to go back to school; Tona did return to school and took a course to become a medical assistant (id., Tr. at 123).  She did not testify that Mr. Southard contributed financially toward her education.

Tona later heard from Plaintiff that Southard's surgery had gone wrong and that he was in dire condition (id., Tr. at 26).  On her first visit on April 2, 2009, Tona noted that Southard appeared swollen, looked fragile, had abdominal tubes draining into buckets, a trach, and a feeding tube (id., Tr. at 29-30, 34).  She saw that his limbs were swollen with taut skin (id., Tr. at 30).  Tona never saw Southard move his legs, stand, or sit up (id., Tr. at 31-32).  Southard's right arm appeared unusable and he smacked his left arm on the bed when he was in pain or reached for Tona (id., Tr. at 31).  He could also move his head, but other than his head and left arm there was no movement (id.).  On the first visit Tona spoke to a doctor who was part of the initial surgery and the doctor said that they placed the stent graft in the wrong place in error (id., Tr. at 32).

Due to the tracheotomy tube inserted into Southard's throat, Tona had to read his lips to communicate with him.  On the first visit he was quiet and tired, and "didn't say a

whole lot." (Id., Tr. at 33.)  The doctors performed multiple operations and tried to operate on Southard's pancreas but could not get to it through scar tissue (id., Tr. at 35).  Doctors talked about fluid buildup and pressure causing issues with his organs, maybe causing the pancreas to leak, but they could not drain fluid fast enough (id., Tr. at 35, 82).

In early June, Tona became Southard's health care proxy (id., Tr. at 36).  Tona learned that Southard suffered from an infection in his bloodstream and became septic (id., Tr. at 44, 45).  Southard also had tachycardia and Tona would receive calls in the night and race to the VA because she was not sure Southard would make it another day (id., Tr. at 44).  Southard also needed blood transfusions, but the doctors did not know why or how he was losing blood (id., Tr. at 45).

Tona observed Southard in "lots of pain" and he would squint his eyes and distort his mouth (id., Tr. at 46).  Tona later was told of Southard's bedsores (id.).  She said that he was "very aware of all the pain that he was having," "he was not out of it," and was conscious (id.).  He could talk (by mouthing words), so Tona concluded he was not completely out of it (id.).  Tona only remembered him being groggy after dialysis or a procedure (id.).  Tona would contact the nurses if she thought Southard was in pain and, if they could not give him more pain medication, she would talk to him and tell him to "go to a happy place" (id., Tr. at 47).

Southard had depressed days and cried, and his depression got worse over time, especially after doctors' visits.  He was happy to see his children but knew that he was dying.  (Id.)  Southard grew tired of all the procedures but wanted to keep trying (id., Tr. at 47-49, 50).  He never told Tona that he wanted to stop treatment, but she heard from nurses in June that he had told them he wanted to discontinue treatment (id., Tr. at 52-

53).  Southard signed a do not resuscitate order (or "DNR"), then later said he did not want it, but it was never removed (id., Tr. at 54).  His face became thinner, his complexion was paler, he appeared more fragile (id., Tr. at 54-55).  He had episodes of acid reflux where bile came out of his mouth and he looked like he was in a lot of pain (id., Tr. at 55-56).  Tona called nurses every evening and they reported that Southard did not sleep well (id., Tr. at 56).  The night nurse told her that he had nightmares and seemed terrified, so the nurse stayed in the room with him (id.).  Tona heard from the nurse that Southard had several bedsores, including a large one near his buttocks.  The bedsores seemed painful. (Id., Tr. at 58-59, 61-63, 64.)  Southard appeared to Tona to be in intense pain, that he was "always in pain" (id., Tr. at 106).

Southard had psychiatric consults where he was evaluated to determine whether he was competent to make medical decisions (id., Tr. at 74, 88).  Psychological staff found him competent, but the evaluation noted that his competency waxed and waned (id., Tr. at 75).  He said that he wanted to stop dialysis, but also said he wanted Tona to make the decisions regarding his care (id., Tr. at 75-76).

On July 17, 2009, there was another family meeting with Dr. Lall (id., Tr. at 85-86).  Southard said that he wanted full care short of resuscitation from cardiac arrest, and that he wanted his DNR to remain in place (id., Tr. at 91-93).  They did not discuss turning off life support but did say that if Southard stopped dialysis he would die (id., Tr. at 91-92).  Southard was depressed during the meeting but Tona tried to stay positive and encourage him to live (id., Tr. at 94).

Around July 20, 2009, a doctor called Tona to set up another meeting (see id., Tr. at 97).  She was surprised that they wanted another meeting so soon and they explained

that Southard had worsened, and they needed to discuss mortality (id., Tr. at 97-98). On July 22, the family met with healthcare providers outside Southard's presence initially (id., Tr. at 100). The doctor said there had been a major decline since July 17 and that they could not do any more (id., Tr. at 102-03). Southard's body could not take dialysis, he was in sepsis that could not be treated by antibiotics, and he would not survive (id., Tr. at 111-12, 113, 44). They proposed that Southard continue to receive aid breathing and pain medication (id., Tr. at 147). Tona felt there was nothing to discuss and did not object (id., Tr. at 112).

The doctors then took Southard's pain medication down so he would be more clear-headed and had a conversation with him while the family was in the room (id., Tr. at 113). They told Southard that there was nothing they could do and asked Southard if he understood (id., Tr. at 113, 115). Doctors told Southard what would happen (id., Tr. at 115). He said yes (id., Tr. at 116). Everything that was "life-sustaining" was then removed (id., Tr. at 116, 119). Southard looked shocked, closed his eyes and did not communicate and withdrew for a few hours (id., Tr. at 116-17, 118). The doctors said they expected Southard to live around three more days (id., Tr. at 117).

Southard did not communicate much after that, but Tona thought that he was still there, understanding the conversations around him (id., Tr. at 119-20). Tona was with him when Southard died (id., Tr. at 121). Tona said that she got the independent autopsy on advice of plaintiff's counsel (id.). Tona paid for Southard's funeral when he did not have enough money in his accounts (id., Tr. at 122).

3.  Howard Warren "Sonny" Southard

Mr. Southard's son, Howard Warren "Sonny" Southard, testified on March 15, 2018 (Docket No. 155, Tr.).  Sonny was born on August 30, 1969, and was 48 years old when he testified (id., Tr. at 5).  Tona is his younger sibling (id., Tr. at 7, 9).  After his parents' divorce, Sonny was moved with his mother and his stepfather and had no means of contacting his father (id., Tr. at 11, 12, 14).  Sonny wanted a relationship with Southard but his mother, Roberta, wanted them separated (id., Tr. at 20-21).  They were reunited when Sonny was 19 years old and after that had a father-son relationship (id., Tr. at 23-24, 25-26).  Sonny, however, did not live with Mr. Southard (id., Tr. at 84).

Mr. Southard taught Sonny about big trucks and rigs, how to change oil filters, air filters, and tires, and carpentry (id., Tr. at 26).  Sonny attended family gatherings with Mr. Southard (id., Tr. at 28, 35-36, 42-43).  Sonny never met his half-brothers from Germany (id., Tr. at 36).  Southard sent Sonny birthday and Christmas gifts from the road, like tools or shirts (id., Tr. at 43).  Sonny borrowed $2,000-3,000 or more from Southard, which Southard never let him repay, even after Southard had retired (id., Tr. at 81, 89).  After this loan, Southard did not give Sonny any other financial support (id., Tr. at 89).  Mr. Southard gave Sonny relationship advice, financial advice, and emotional support (id., Tr. at 83).  Mr. Southard encouraged Sonny to get his GED more than anyone else in Sonny's life (id., Tr. at 41-42).  Mr. Southard also had relationship with his granddaughter, Sonny's daughter (id., Tr. at 28, 30).

Mr. Southard's work as an over-the-road trucker kept him away from home (id., Tr. at 31), but he tried to get home for holidays (id.).  Sonny contacted him by telephone, mail, or airwave (id., Tr. at 34-35).  Sonny testified that it was a little easier to get together

after Southard retired, but Sonny was still busy with his work (id., Tr. at 44).  Sonny maybe saw Southard four to five times in the six months before the surgery (id., Tr. at 87).

After the April 2009 surgery, Sonny received a call from Tona saying that something had gone wrong (id., Tr. at 47).  Sonny visited and described Southard's room as smelling like rotting flesh (id., Tr. at 51).  Southard was able to communicate with Sonny a little bit, saying that he was scared and that he loved Sonny (id.; see also id. Tr. at 63-64 (smell from bedsore)).  Sonny recalled speaking to a healthcare provider at the VA who said, "we made a mistake" (id., Tr. at 53).  Sonny was told that Southard had the long-term consequence of being on dialysis for the rest of his life (id., Tr. at 56, 57).

Sonny visited Mr. Southard and sometimes Southard was sedated, other times he could communicate (id., Tr. at 51-52, 99-100).  He could only move his head and his hands after the surgery (id., Tr. at 56-57).  Sonny saw frustration in Southard's face assumed from Southard's pain; Sonny saw Southard squint and have tears (id.). Southard mouthed words to Sonny the words "pain" and "ow" and made pain sounds (id., Tr. at 59-60, 51, 98-99, 61).  When Southard was in pain, Sonny would call for a nurse and ask for pain medication (id., Tr. at 116-17).  Sonny thought Southard's pain came and went when the pain medication wore off (id., Tr. at 61).

As Southard was told by doctors about his kidneys, Sonny reported that Southard mouthed "oh, my God, they F'ing killed me" (id., Tr. at 60).  Southard's condition got worse over time, his complexion became grey and he looked like he was getting toward the end (id., Tr. at 62, 63).

Mr. Southard developed bedsores throughout his 118-day hospitalization, sores above his buttocks that Sonny observed (id., Tr. at 63-64).  Sonny admonished VAMC

staff to address these bedsores (id., Tr. at 65) but these wounds were not properly cared for, leading to septic shock (id., Tr. at 64, 65; Docket No. 157, Tr. at 156 (Dr. Lall); Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶¶ 389-93).  At his deposition, however, Sonny stated that he never saw a bedsore and was only told about it (Docket No. 155, Tr. at 110).  None of the surgeries seemed to help Southard's recovery (id., Tr. at 69).  Doctors attempted to kill Southard's infection by direct penicillin injection (id.) but Sonny later learned that the antibiotics were not working (id., Tr. at 70, 73 (that the infection "killed" the penicillin)), and required Southard to be placed in isolation with visiting family members having to wear caps, gowns, and gloves in Southard's presence (id., Tr. at 69, 70).

On July 18, 2009, Sonny attended a family meeting with Southard's care team (id., Tr. at 71).  At that time, they said they would do whatever they could to save Southard and seemed hopeful for his recovery (id., Tr. at 72).  Sonny said that the VAMC would try dialysis on both kidneys, but it ended up not working (id., Tr. at 73).  Southard's energy was low after dialysis, and his wounds got worse (id.).  He had swelling around his incision, bruises on his arms and legs, the stench increased, and his complexion was pale (id., Tr. at 74).  Southard also was depressed and did not want any procedures done but Tona talked him into continued treatment (id., Tr. at 74-75).

Sonny went home after the July 18 meeting and was not at the second meeting (on July 22), where the healthcare providers said there was nothing more they could do (id., Tr. at 75-76).  He heard from Tona that care would be discontinued and returned that night to stay with Southard until he died (id., Tr. at 76, 79).

On cross-examination, Sonny said that Southard appeared comfortable in his last days and had a trach tube to assist his breathing (id., Tr. at 108; see id., Tr. at 77, 78). Southard also appeared frightened and scared to Sonny (id., Tr. at 109).

4. Dr. Hasan Dosluoglu

Dr. Hasan Dosluoglu testified over three days of the trial (Docket Nos. 146 (Feb. 8, 2018), 147 (Feb. 9, 2018), 152 (Mar. 26, 2018), Tr.).  Dr. Dosluoglu assisted Dr. Lall in attempting to save Southard's renal arteries during the EVAR surgery (Docket No. 146, Tr. at 10; Docket No. 147, Tr. at 30, 33-34).  Dr. Dosluoglu is board certified in general surgery and vascular surgery (Docket No. 151, Tr. at 90).  In 2009, the Buffalo VAMC was the second busiest vascular surgery service in the country (id., Tr. at 87) with two full-time attending physicians, Drs. Dosluoglu and Lall (id.).  Dr. Dosluoglu performed 200 to 250 EVARs prior to April 2009 (id., Tr. at 97), using different grafts as they were approved (id.).  In April 2009, Dr. Lall reported to Dr. Dosluoglu (Docket No. 146, Tr. at 12).

Dr. Dosluoglu did not recall ever speaking to Southard's family; Dr. Lall would have since Dr. Lall was the attending on Southard's case (id., Tr. at 23; Docket No. 147, Tr. at 29).

A CT scan was performed on Southard on March 17, 2009, revealing that he had an infrarenal 6.2 cm. (or approximately 2⅜-inch) abdominal aortic aneurysm (or "AAA") (Docket No. 146, Tr. at 28, 43, 31; Tr. Ex. 113, at 7576).  An aortic aneurysm is a weakening of the aorta wall (Docket No. 146, Tr. at 29) and a AAA is a dilation of the aorta to one and a half times its normal size (id.).  A 6.2 cm. aneurysm carries a very high risk of rupture (id., Tr. at 56).

Dr. Dosluoglu recalled Southard's aortic aneurysm was large.  Southard had an asymptomatic aneurysm (which is typical), though the size was a high risk for rupture and 50% of people that experience a rupture do not make it to the hospital (id.).  The aneurysm was located entirely below Southard's renal arteries.  The "neck" is the distance from the top of the aneurysm to the bottom of the renal artery.  (Id., Tr. at 46-47.)  Dr. Dosluoglu did not recall the length of Southard's neck but did recall that it was long (meaning there should have been no risk of renal artery coverage) (Docket No. 146, Tr. at 49, 184). Southard also had a good neck angle and minimal tortuosity (twisting), making him a good candidate for EVAR surgery (id., Tr. at 183-84).  The doctors would have recommended the EVAR (which has a lower morbidity and faster recovery time than an open procedure), but Southard would have made the ultimate decision as to the type of surgery (Docket No. 146, Tr. at 90-91, 94).

In EVAR, a stent graft is placed in the aneurysmal area of the aorta by accessing the groin and performing the procedure under x-ray guidance (id., Tr. at 53).  The stent grafts are delivered from the groin and positioned into place and then expanded to seal the neck of the aorta and the iliac arteries (id.).  Thereafter, blood flows through the covered stent, so that it does not pressurize the aneurysm wall (id., Tr. at 54).

Intraoperative measurements for deploying the stent graft are made by angiograms while the patient is on the operating table (id., Tr. at 196).  The table can be moved by the surgeon through hand controls (id., Tr. at 199-201).  The angiogram is made by fluoroscopy using the "C-Arm," which fits across the patient and shoots x-rays upward (id., Tr. at 199).  The C-Arm can be moved by the surgeon or anesthetist (id., Tr. at 201).  During the EVAR, marks are made on the monitor attached to the C-Arm to

indicate the position of the renal arteries (Docket No. 147, Tr. at 5).  Those marks can be made by the surgeon or by the manufacturer's representative at the surgeon's direction (id., Tr. at 7-8).  If the C-Arm were moved after marks were made, those marks would not be aligned and those marks would no longer be reliable (id., Tr. at 11).  However, the C-Arm is heavy and very hard to move when locked down.  Even when it is not locked, it needs a strong push to move.  (Id., Tr. at 11-12.)  Dr. Dosluoglu later testified that Dr. Lall thought the table and C-Arm were locked down (Docket No. 151, Tr. at 72).

The stent graft used in Southard's surgery had "suprarenal barbs" – wires or hooks that fix the stent graft into place (Docket No. 146, Tr. at 176).  These barbs attach to the walls of the aorta and keep the stent graft from pulling down with the blood flow (id.).

Dr. Dosluoglu became involved in the surgery when he came to check how things were going right at the time that Drs. Lall and Khan realized that the renal arteries had been covered (Docket No. 147, Tr. at 30, 33).  Dr. Lall remained the primary surgeon after Dr. Dosluoglu scrubbed in; Dr. Dosluoglu took over from Dr. Khan as the first assistant; and Dr. Khan became the second assistant (Docket No. 147, Tr. at 33-34).  They initially discussed trying to pull the stent down to uncover the renal arteries but were unable to move it and were worried they might tear the aorta (id., Tr. at 34-35).  They then tried to cannulate the artery opening (remove the blockage) with a wire, but this also did not work (id., Tr. at 35, 36).  The doctors ultimately made a renal bypass from the femoral arteries hoping to salvage the kidneys.

After multiple procedures, including reopening Southard to remove a block in the femoral artery and placing a large bore catheter for dialysis, Southard was taken to ICU (Docket No. 151, Tr. at 42-77).  He was intubated and placed on a ventilator (id., Tr. at

76).  At that time, Dr. Dosluoglu thought that the kidneys might be working again in four to six weeks, but dialysis was needed until the kidneys came back online (id., Tr. at 78).

There was no defect with the choice or size of stent or the stent itself (id., Tr. at 63).  There was no reason the stent graft could not have been placed without covering the renal arteries (id., Tr. at 64).  At deposition, Dr. Dosluoglu stated that it was "incredible" that the stent covered the arteries and that it must be that something moved (id., Tr. at 64-67).  Dr. Dosluoglu could not rule out that the graft was improperly placed because he was not in the room (id., Tr. at 72).

Dr. Dosluoglu teaches students to do an angiogram immediately before the suprarenal barbs are deployed (id., Tr. at 80-81).  There is no set number of angiograms that should be taken, the number depends on how sure you are regarding placement of the arteries (id., Tr. at 103-04).

After the surgery, Dr. Dosluoglu investigated what went wrong and also talked at length with Drs. Lall and Khan, but he does not recall the details of those conversations (Docket No 146, Tr. at 191-93; Docket No. 151, Tr. at 20-21, 28).  He also followed Southard's post-operative care closely, giving guidance to Dr. Lall and following the charts (Docket No. 151, Tr. at 28).

Southard's pain was monitored by the nurses who spent the most time with the patients (id., Tr. at 106).  Even when a patient is not responding verbally, nurses can monitor pain through other indications like heart rate or blood pressure change.  A patient who is unresponsive may still have an intolerance to pain.  For example, if the heart rate increases, a nurse may try to increase pain medication to address that.  (Id., Tr. at 133.)

Over the course of his hospital stay, Southard became more responsive until the dialysis was discontinued, then he became less responsive (id., Tr. at 132).

Dr. Dosluoglu was not present at family meetings but stated that, whether a doctor thinks a patient's position is futile does not matter; the doctor in such a situation simply presents the facts and the patient and/or family make the ultimate decisions (id., Tr. at 37, 40-41).  Usually physicians do not make recommendations regarding end of life care, they only offer data to the patient or family (id., Tr. at 51-54).

5.  Dr. Mohammad Usman Nasir Khan

Dr. Mohammad Khan, who performed the surgery on Mr. Southard (Docket No. 157, Lall Tr. at 32-34), had his deposition testimony (taken on July 17, 2012, Docket No. 206, Khan Tr. at 9) read into the record (Docket Nos. 206 (May 30, 2018), 207 (June 5, 2018)).  Dr. Khan was a fellow at the VA Hospital at the time of Southard's surgery and deployed the stent that covered the renal arteries.  Dr. Khan treated Southard from April 1, 2009, through June 23-24, 2009, when he finished his fellowship (Docket No. 206, Tr. at 23).  Dr. Khan spent approximately 9 months of the two-year fellowship intermittently at the VA (id., Tr. at 24).  Before his fellowship, Dr. Khan did his residency at University of Connecticut in general surgery and was involved in many EVAR surgeries there (id., Tr. at 30-31).  He was trained by company representatives from Gore and Cook (id., Tr. at 39-40).  Dr. Khan did not blame Mr. Southard's adverse outcome on the equipment used in the surgery (Docket No. 207, Tr. at 6).  At the time of Southard's surgery, Dr. Khan was certified to use the device as an independent surgeon (or would be very soon – he was certified in June 2009 when he graduated) (id., Tr. at 7).

Dr. Khan described the process for the surgery, that he would do an angiogram, mark the renal arteries, do a second angiogram, and then deploy the device (id. Tr. at 25).  Dr. Khan agreed that inadvertent coverage of the renal arteries is a deviation from good practice (id., Tr. at 35).

Dr. Khan had discussions after the surgery regarding what happened, but never concluded on how the arteries were covered, because they did everything that was supposed to be done including three angiograms and all other checks (id., Tr. at 35).  A first or "initial" angiogram was done before getting access to the aorta (id., Tr. at 67-68).  A second angiogram was completed when ready to deploy, to ensure that nothing had moved and reconfirm the location of the renal arteries (id., Tr. at 68-73).  Then the main body of the stent is deployed without releasing the suprarenal barbs and the surgeon compares the position by looking at the marks on the screen (id., Tr. at 70).  After the contralateral graft is deployed, then the suprarenal barbs are deployed (id., Tr. at 73).  A third, completion angiogram is done after full deployment (id., Tr. at 75).  That is the point at which Dr. Khan discovered that Southard's renal arteries were covered, since they showed very weak flow (id., Tr. at 75).

It was possible that the C-Arm or table moved, or that the graft moved or was pushed by aortic pulsations (id., Tr. at 37).  The error occurred during deployment of the main body of the stent (id.).

6.  Dr. Purandath Lall

Dr. Purandath Lall testified over three days (Docket Nos. 157 (Mar. 29, 2018), 164 (June 25, 2018), 172 (Oct. 10, 2018)).  In 2009, he was attending surgeon for

Southard's operation and subsequent care (Docket No. 157, Tr. at 15, 32-33).  Dr. Lall was chief of vascular surgery at VAMC from 2009 until 2013 (id., Tr. at 13).

Dr. Lall came to the Buffalo VAMC in 2007 after completing a fellowship in vascular surgery at the Mayo Clinic (Docket No. 164, Tr. at 99-100; Docket No. 157, Tr. at 28).  During his fellowship, he did a mixture of endovascular and open surgeries.  He completed at least 300 endovascular surgeries, more than 50 of which were EVARs. (Docket No. 164, Tr. at 100.)  He was board certified for general surgery in 2006 and for vascular surgery in 2008 (id., Tr. at 101).

### a.  Mr. Southard's April 1, 2009, Surgery

Dr. Lall met Mr. Southard on April 1, 2009, the morning of the EVAR surgery (Docket No. 157, Tr. at 22-23).  Dr. Lall testified that Southard had excellent anatomy for the EVAR procedure and nothing in the anatomy would have prevented proper placement of the device, meaning that Southard's anatomy did not contribute to coverage of the renal arteries (Docket No. 164, Tr. at 14; cf. Docket No. 157, Tr. at 22, Docket No. 164, Tr. at 14 (stating anatomy was "adequate" for procedure)).

The device used that day, the Cook Zenith, was the first and only device with suprarenal fixation barbs[4] at that time (Docket No. 157, Tr. at 24-25).  The barbs prevent downward migration of the stent graft (id., Tr. at 25).  Dr. Lall was trained by Cook but does not recall certification (id., Tr. at 27).

Dr. Lall supervised Dr. Khan, who was in his second year as a vascular surgery fellow and was already a board-certified general surgeon (id., Tr. at 32-33).

---

[4]Barbs, hooks, and fixation devices were used interchangeably in the testimony.

On this Court's questioning, Dr. Lall went step-by-step through the procedure, referring to the surgery report (Docket No. 164, Tr. at 64, 67-70, 71; Jt. Tr. Ex. 113, at 7768, duplicated at Jt. Tr. Ex. 61) and the imaging from the procedure, which includes angiograms and x-rays (Docket No. 164, Tr. at 69; Jt. Tr. Ex. 13). Dr. Lall explained that images 1 and 2 depicted how the device was inserted through the groin, with wires coming from the right and left (note that left and right here refer to the patient's body, so the left limb is displayed on the right side of the image) (Docket No. 164, Tr. at 72-73). Image 2 was the first angiogram taken of Mr. Southard (id., Tr. at 72). The position of the renal arteries is then marked and identified based on the angiogram, which can be either static or dynamic/live video (though there were only static images in evidence) (id., Tr. at 73-74). This is the second angiogram taken (id., Tr. at 73-74).

Dr. Lall did not have an independent recollection of who marked the placement of the renal arteries, but this is usually done by either the company representative or a nurse (Docket No. 157, Tr. at 165; Docket No. 164, Tr. at 20-21). Once the surgeon is happy with the position, the main body of the device (the portion in the aorta) is deployed without deploying the suprarenal hooks as depicted in image 3 (Docket No. 164, Tr. at 57, 73-74). Image 4 showed the left and right renal arteries clearly and the device deployed under direct fluoroscopic guidance (id., Tr. at 75-76). Dr. Khan deployed the main body of the stent graft (Docket No. 157, Tr. at 168).

Dr. Lall testified that he recalled two angiograms, one taken before deploying the stent graft and a second one to ensure that the stent graft was below the renal blood vessels (Docket No. 164, Tr. at 56). Sometimes a third, a fourth or multiple angiograms are taken, if necessary, to locate the best place for deploying the stent graft (id., Tr. at

56-57).  Once "happy with the position," the surgeon deploys the stent graft (id., Tr. at

57).  At the end of the procedure, a final angiogram is taken "to make sure that . . . what

we've done is an appropriate fixation" (id.).

   After the main body was deployed, the C-Arm was moved for gate cannulation

(id., Tr. at 43-44).  According to Dr. Dosluoglu, gate cannulation is going

> "to the area of the renal artery with the catheters, which are directed and
> with wires, so that you poke in that area and hope that you can find a little
> opening between the graft and the – and aortic wall, which would lead you
> to the opening of the renal artery take off"

(Docket No. 147, Dosluoglu Tr. at 37; see also id., Tr. at 38; Docket No. 197, Gov't

Proposed Findings of Fact ¶ 71).  When cannulation is not successful, however,

endovascular surgery is converted into an open procedure (Docket No. 157, Lall Tr. at

37; Docket No. 197, Gov't Proposed Findings of Fact ¶ 71).

   The stent has two legs – like a pair of pants - and one of the pant-legs is shorter

than the other (Docket No. 164, Lall Tr. at 54-55).  The entrance (portion where the foot

would come out on a pair of pants) of the pant-leg is called the "gate" (id.).  Dr. Lall drew

a picture of what looks like very high-waisted pants (the waist is the "main body" of the

stent that covers the aortic aneurysm) with two legs coming down, one which is about

half the length of the other (these go into the arteries that branch off from the aorta)

(id.).  The left limb of the device is deployed and the gate (opening) is cannulated (id.,

Tr. at 76-77).  After cannulation of the left limb, the suprarenal barbs are deployed (id.),

which takes only a few seconds (id., Tr. at 27).  Their deployment is denoted in the

surgery report when they describe the "top cap" (id., Tr. at 90).  Then the right limb is

cannulated (id., Tr. at 78).

Gate cannulation does not always require movement of the C-Arm (id., Tr. at 55-56, 91-92).  The marking of the renal arteries is done with high magnification to ensure accuracy, then the view is zoomed out to see the bottom aspect for placement of the left and right limbs (id., Tr. at 55-56).  Doctors usually have a sufficient view of the area for gate cannulation just by zooming out but, if there is not a full view, then the C-Arm is moved (id., Tr. at 56).  There is no indication in the surgery note that the C-Arm was moved here and Dr. Lall stated that he did not recall if the C-Arm was moved, though he did testify that it was moved at his deposition (id., Tr. at 91).

Once gate cannulation is completed, balloons are used to dilate overlap sites and landing zones (id., Tr. at 78-79).  Image 13 from the "completion" angiogram showed the slow profusion of the renal arteries (id., Tr. at 81).

Image 14 showed a magnified view, with no profusion to the right renal artery and only a little to the left (id., Tr. at 82-83).  Dr. Dosluoglu came in as Drs. Lall and Khan realized this and confirmed that there was no blood flow to the kidneys (Docket No. 157, Lall Tr. at 37; see Docket No. 147, Dosluoglu Tr. at 33).  Because of the lack of profusion to the renal arteries, the doctors attempted to access them from below (through the groin) and above (through the brachial artery) to open them up (Docket No. 164, Lall Tr. at 82).  At that point, they thought there might be partial coverage, or that there could be plaque or thrombus blocking the arteries (id.).

Once the surgeons determined that there was a blockage that could not be fixed by cannulating the arteries during the endovascular procedure, they converted to an open surgery (id., Tr. at 86).  The surgeons then closed the surgery but found that there

was no pulse in Southard's left foot.  The surgeons reopened Southard and removed a clot, after which blood flow was restored to the foot.  (Id., Tr. at 88-89.)

Southard started dialysis the night of his procedure because he was not producing urine and no urine could be a sign of acute kidney injury from lack of blood flow (Docket No. 157, at 41-42).  He was intentionally sedated while on the ventilator, which he needed because it was a long surgery (id., Tr. at 48-49).  Based on his condition, the doctors kept him on the ventilator overnight (id., Tr. at 49).

While the doctors were still operating, they sent someone out into the waiting room to tell the family that there had been an adverse event and that the surgery had been converted from EVAR to open (id., Tr. at 37-38).  At the end of the surgery, Dr. Lall himself went out to explain what had happened.  Because none of the relatives were still there, Dr. Lall called Plaintiff.  (Id., Tr. at 39; Docket No. 164, Tr. at 102-03.) He told her that there had been unintentional coverage of both arteries and described what happened what they did to salvage the renal arteries (Docket No. 157, Tr. at 40-42).  He also discussed the hemodialysis, which Dr. Lall told Plaintiff could be short-term or could be lifelong (id., Tr. at 42).  Dr. Lall also told her that Southard was admitted in ICU (id.).  He said that he was sorry and stated that there was inadvertent coverage of the renal arteries (Docket No. 164, Tr. at 103-04).

Dr. Khan finished his fellowship in June and left VA before Southard died (Docket No. 157, Tr. at 165).  Before Dr. Khan left, they discussed potential causes for covering the renal arteries (id., Tr. at 165-66).  Dr. Lall has narrowed down possible causes for the coverage to two:  operator error, meaning that the stent graft was deployed too high (id., Tr. at 166-68), or movement of the C-Arm or the operating table (id., Tr. at 168).

Prior to Southard's surgery, Dr. Lall spoke with colleagues regarding inadvertent coverage of the renal arteries in an "academic" way, because this is a known complication of the EVAR procedure (Docket No. 164, Tr. at 21-22, 28).  He also discussed coverage of the renal arteries after April 2009 in a "hypothetical" or "theoretical" way, without giving away any patient details regarding Southard (id., Tr. at 28).  One reason for these discussions was to ensure that this never happened again (id., Tr. at 30-31).  Dr. Lall has never had a previous case where there was total coverage of both renal arteries in an EVAR or heard of such a case (Docket No. 157 Tr. at 168-69; Docket No. 164, Tr. at 19, 20), or had one since (Docket No. 157, Tr. at 171).  Unintentional full coverage of both renal arteries is extremely rare (id., Tr. at 43).  He had heard of only one case involving coverage of the renal arteries, which was a partial coverage that occurred during his fellowship training and involved a different stent graft (Docket No. 164, Tr. at 22-23).  Dr. Lall was not aware of any cases where a Zenith Stent Graft with suprarenal barbs was used and both the arteries were covered (id.).  Dr. Lall also performed research on this and found a report where the proposed cause of renal coverage was retrograde (meaning, against the flow of blood—as there was here) migration of the stent graft, which involved a Cook device (id., Tr. at 32-33, 35-36, 40-42).  All other cases that Dr. Lall was aware of that involved movement were antegrade movement, meaning that the stent moved downward, with the flow of blood, and did not block the arteries (id., Tr. at 41).

### b.  Mr. Southard's Post-Operative Care

The vascular team caring for Southard consisted of two doctors (Dr. Lall and Dr. Dosluoglu), a fellow, rotating residents, one physician's assistant, and a nurse

practitioner (Docket No. 164, Tr. at 114).  They saw Southard at least once a day on rounds, and sometimes more when there were changes to treatment or an issue to be addressed (id., Tr. at 114-15).

Throughout his hospitalization, Mr. Southard suffered from metabolic acidosis (Docket No. 157, Tr. at 82-83, 156; Docket No. 172, Tr. at 49).  He also suffered from back pain and hypertension (or hypotension) and was prescribed Dilaudid for the back pain (Docket No. 157, Tr. at 139-40, 156; Docket No. 172, Tr. at 70).  Dr. Lall noted that Mr. Southard also had multiple pressure ulcers (or bedsores) during his prolonged hospital stay (Docket No. 157, Tr. at 150-53; see Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶¶ 384, 386).  Mr. Southard also suffered from hospital-acquired pneumonia, which did not improve with antibiotics (Docket No. 157, Tr. at 158-59; Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶ 394).

Dr. Lall sometimes communicated directly with Southard (Docket No. 164, Tr. at 112).  Dr. Lall observed Mr. Southard had varying levels of alertness and orientation based on the sedatives, pain medication, and his general condition (id., Tr. at 112-13).  When he was alert and oriented, Southard could communicate by nodding, mouthing words, or pointing (id., Tr. at 113-14).  Dr. Lall never observed Southard banging his fist on his bedrail (id., Tr. at 114).

Mr. Southard had been "trached" (i.e., had a tracheostomy) on May 9, 2009, which meant they could "start backing off the sedation" (Docket No. 172, Tr. at 14).  When prompted on re-direct, Dr. Lall explained that a tracheostomy is performed "to make the patient more comfortable" (Docket No. 172, Tr. at 85; see id., Tr. at 13).

Southard was on multiple medications, including Fentanyl, which is an opioid 100 times more potent than morphine, and Hydromorphone[5], an opioid that is four to six times more potent than morphine and releases more slowly (Docket No. 164, Tr. at 138, 142).  He was also on sedatives and muscle relaxants (id., Tr. at 139).  Finally, he was on medications such as Lorazepam and Versed (both benzodiazepines) to assist him in sleeping; Dr. Lall also testified that Lorazepam is used to treat anxiety (Docket No. 172, Tr. at 18-22).  Southard had several blood transfusions due to anemia caused by sepsis and bleeding for which the doctors were not sure the cause (or "covert blood loss").  Southard also had bleeding in his gastro-intestinal tract (Docket No. 164, Tr. at 48-49).  Southard also had "stage 2" decubitus ulcers (bedsores) that required wound care, including debridement and application of medications (id., Tr. at 49-51).  Dr. Lall testified that such treatments can be painful, though patients generally describe a stinging sensation; the bedsores themselves are painful (id., Tr. at 52).  Sepsis can also be painful, depending on the etiology of the sepsis (Docket No. 157, Tr. at 146).  Southard made periodic reports of pain, Dr. Lall testified that when Southard was not intentionally sedated, he could communicate with staff relative to his comfort and pain (id., Tr. at 133, 134).

Through Dr. Lall's testimony and Southard's medical records, the Government summarized his condition from April 1 to July 29, 2009 (Docket No. 197, Gov't Proposed Findings of Fact ¶¶ 133-94).  After surgery on April 1-9, 2009, he was intentionally sedated (id. ¶ 134).  Southard's behavior status was "CL" or calm, his pain intensity score was "99" because he could not give a verbal response as to his pain score (id.

---

[5]Also known as Dilaudid, see Docket No. 196, Gov't Proposed Conclusions of Law at 38.

¶¶ 135-36), and he was comfortable (id. ¶ 138).  He was administered Propofol,

Fentanyl, and Versed (id. ¶ 137).  A note in his medical record on April 4 stated

Southard experienced no pain (given the absence of his complaints, pain behaviors, or

reports by family or friends suggesting pain) (id. ¶ 138).

On April 10-24, 2009, Southard was off sedation, but he still had no pain or

minimal pain (id. ¶ 139).  He remained on Fentanyl and Versed (id. ¶ 140).  He was

unresponsive and calm/cooperative (id. ¶ 142) with no symptoms of pain or discomfort,

with a score of "99" (id. ¶ 141).  As noted by Plaintiff, from April 17, 2009, Mr. Southard

"was noted having been acutely 'alert'" and remained so until his death on July 27, 2009

(Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶ 320; Jt. Tr. Ex. 114, at

Bates #3849).

On April 24 to May 6, 2009, Mr. Southard was noted to have no or minimal pain,

while oriented/lethargic, cooperative/withdrawn, with weak speech (Docket No. 197,

Gov't Proposed Findings of Fact ¶ 144), he was sedated and cooperative (id. ¶ 145),

receiving Hydromorphone, Versed, and Fentanyl (id. ¶ 146).  On April 25, Mr. Southard

was non-responsive and on the next day was intubated due to respiratory distress (id.

¶ 148).  Southard could not breathe on his own and needed a tracheostomy (id. ¶ 393).

On April 27, a Perma-Cath was placed to permit vascular access for dialysis and to

reduce the risk of infection (id.; Docket No. 151, Tr. at 142).

On May 7-19, 2009, Mr. Southard was weaned off sedation and became more

alert (Docket No. 197, Gov't Proposed Findings of Fact ¶ 149).  He was medicated with

Versed, Fentanyl, and Hydromorphone for pain and Ativan and Lorazepam for anxiety

(id. ¶ 150).  Southard occasionally complained of pain and received pain medication (id.

¶ 151). Southard also exhibited symptoms consistent with the development of sepsis (from notes on May 15, 2009, Bates #6936)—including a spiked temperature, faster pulse, quick breathing, and anxiety (which Southard had not suffered from prior to his hospitalization) (Docket No. 172, Tr. at 89).

On May 20-31, 2009, he was generally awake and alert, but sometimes was lethargic (Docket No. 197, Gov't Proposed Findings of Fact ¶ 152). The Government contends that Southard did not experience significant pain (id. ¶ 153). He remained on Hydromorphone for pain and Lorazepam for anxiety (id.). On May 20, Southard underwent a Perma-Cath exchange, with Southard wincing in pain, awake, and responding to voice (id. ¶ 154). On the next day he was sedated and was noted not to be experiencing pain (id.).

On June 1-7, 2009, Mr. Southard appeared more comfortable, sedated, cooperative, and withdrawn, still receiving Hydromorphone and Lorazepam (id. ¶¶ 155-56). On June 8, he underwent exploratory surgery and placement of a feed jejunostomy and was medicated for comfort during that surgery (id. ¶ 157). On June 9-15, 2009, Mr. Southard was alert/withdrawn, cooperative, and sometimes responded to his name and commands, receiving Fentanyl and Lorazepam (id. ¶¶ 158, 159, 161).

On June 15, he expressed his desire to not have any more major procedures done; Dr. Lall noted that he had been on narcotics and sedatives for a long time and wanted to be sure that Southard could make medical care decisions (id. ¶ 161; Docket No. 172, Tr. at 24). On June 16, Southard was alert, responsive, and cooperative, still being administered Lorazepam and Fentanyl (Docket No. 197, Gov't Proposed Findings of Fact ¶ 162). A neuropsychologist attempted two times to evaluate Southard; the first

41

time he was difficult to orient while later he was able to answer yes/no questions but

had an equivocal understanding about his condition.  He did not want to continue

dialysis, but he was not sure he had had kidney failure.  The neuropsychologist

concluded that Southard appeared able to make his own healthcare decisions but his

ability to do so "waxed and waned."  (Id.)  On June 17, Dr. Lall spoke to Southard and

his daughter (Tona) and the doctor observed that Southard was more awake and alert

(id. ¶ 163; Docket No. 172, Tr. at 24-25).  Dr. Lall and Tona discussed that if Southard

stopped hemodialysis "it would be lethal" (Docket No. 172, Tr. at 23).  Dr. Lall explained

Southard's hospital course and that hemodialysis was lifesaving; Southard then agreed

to continue dialysis (id., Tr. at 26; Jt. Tr. Ex. 118, at 6330).  Southard received

IV Fentanyl and Lorazepam (Docket No. 197, Gov't Proposed Findings of Fact ¶ 163).

On June 18-30, Mr. Southard was awake and alert, responsive and cooperative,

and somewhat withdrawn (id. ¶ 164).  IV Fentanyl and Lorazepam continued until

June 22, when Southard received only Fentanyl (id. ¶ 165).  On June 28, Southard was

alert but restless at times, but remained cooperative/alert (id. ¶ 167); he shook his head

and slapped the side rail (id.).  He was given Ativan for relief, Lorazepam, and Fentanyl

(id.).  On June 30, Southard complained of back and abdominal pain, and he was

administered Fentanyl and Lorazepam (id. ¶ 168).

On July 1-6, 2009, Mr. Southard was not assessed as being in pain except on

July 4 and he was sedated; he appeared comfortable on July 3, 5, and 6 (id. ¶ 169).  He

appeared agitated on July 2 and was given Ativan and his dosage of Fentanyl was

increased (id. ¶ 170).  He was confused on July 3 and agitated on July 4 and 5 but less

agitated on July 6 (id.).  On July 7, Mr. Southard was comfortable, in no apparent

distress, and nodded "no" when asked if he was in pain (id. ¶ 172; see id. (Southard

was alert July 8, 12, was calm July 9)).  Plaintiff was receiving Fentanyl (id. ¶ 173).

On July 13, Southard's medical record indicated that he had no pain, but he

continued to receive Fentanyl (id. ¶ 174).  On the next day, Southard was awake and

answering yes or no questions and reported he was not in pain and Fentanyl was

managing his pain (id. ¶ 175).  On July 15, Southard was in no apparent distress while

still on Fentanyl (id. ¶ 176).  In discussing with a neuropsychologist about his

healthcare, Southard made clear that he wanted to be kept comfortable but no longer

wanted to be kept alive by artificial means (id.).  The hospital ethicist met with Southard

the next day and informed him that withdrawal of care would lead to his death and

Southard was "floored by it."  Dr. Lall had told the ethicist that Southard's prognosis "in

the sense of likelihood of survival to discharge is roughly 10-20%."  (Id. ¶ 177.)

Southard was examined and denied pain (id. ¶ 178).  On July 17, Dr. Lall noted that

Southard seemed more alert and still received Fentanyl (id. ¶ 179).  On the next day,

Southard was noted to be alert and made his needs known, he was medicated on bolus

Fentanyl for back pain (id. ¶ 180).  He said he had pain in his abdomen and upper back

at a level of 7 (on a 10-point scale) (id.).  On July 19, Southard was alert but restless,

calm and withdrawn, now receiving IV Fentanyl; Southard had pain score between

1 and 3 (id. ¶ 182).  A psychologist evaluated Southard and found that he might have

depression and a touch of delirium (id.).  Dr. Lall noted that Southard's condition had

deteriorated between July 17 and 21, leading him to request a meeting with his family

(id. ¶ 183; Docket No. 172, Tr. at 36-37).  Southard at first was noted to be in pain but

when later evaluated by a surgical resident, he denied being in pain (Docket No. 197, Gov't Proposed Findings of Fact ¶¶ 183, 184).

On July 22, 2009, Southard was doing better, sleeping, and was not in pain (id. ¶ 185). On that day, there were family meetings (the first without Southard and the second with him) to discuss Southard's future treatment (id. ¶ 189; Docket No. 172, Tr. at 38). On July 22, 2009, at the family meeting, Dr. Lall told the family that Southard's prospects were "dismal," and he would not survive hospitalization (Docket No. 157, Tr. at 123-33). The medical staff believed that Southard's "prognosis was worsening" and that "he had a significant deterioration in his overall condition" (id., Tr. at 120; Docket No. 172, Tr. at 37). Dr. Lall said that he would have told the family that if they stop treatment, Southard would die (Docket No. 157, Tr. at 125, see also, id., at 108-09; Docket No. 172, Tr. at 23). Dr. Lall said that his role is to inform the family of options and potential outcomes, and that it is up to the family to decide which option to pursue (Docket No. 157, Tr. at 126). At that time, there were no new options to save Southard's life: either continue current treatment (which he said would have been "essentially futile" given the inability to cure Southard's infection) or switch to palliative care (id., Tr. at 127). The palliative treatment would mean discontinuing dialysis, PEG (percutaneous endoscopic gastrotomy, or post-pyloric tube, Docket No. 172, Tr. at 86) feedings, and antibiotics, but continuing ventilator and pain medication (Docket No. 157, Tr. at 128; Docket No. 172, Tr. at 41).

Dr. Lall reported the options for Southard and his family for continuing hemodialysis, feedings, IV antibiotics, and supportive care or palliative care. Dr. Lall believed that there were no options that would save Southard's life and that he would

not survive hospitalization.  (Docket No. 197, Gov't Proposed Findings of Facts ¶¶ 187, 188; Docket No. 157, Tr. at 126-27, 124-25.)  The family and Southard understood that stopping dialysis would result in death and they agreed to limit treatment (Docket No. 197, Gov't Proposed Findings of Fact ¶ 189).  Southard chose transfer to palliative care (id. ¶ 190; Docket No. 157, Tr. at 130).

After the meeting, Southard was placed on comfort measures and limitations of care, with hemodialysis, PEG feedings, and IV antibiotics discontinued (Docket No. 197, Gov't Proposed Findings of Fact ¶ 193).  Southard remained on a ventilator and received medication (Fentanyl) for pain (id.).  From July 23 to his death on July 27, Mr. Southard rested comfortably and did not appear to be in any pain, receiving Fentanyl and Lorazepam (id. ¶ 194).

C.  Expert Testimony

Both sides produced doctors as experts as to the standard of care and the treatment of Mr. Southard.  Plaintiff's expert, Dr. Barton Muhs (Docket No. 169, Tr. Oct. 11, 2018), and the Government's expert, Dr. David Gillespie (Docket No. 182, Tr. Nov. 14, 2018), each testified as to appropriate standard of care.  Plaintiff also offered Dr. Mark LeVaughn, forensic pathologist, who performed the autopsy of Mr. Southard (Docket No. 150, Tr. Mar. 8, 2018, at 17-18).

1.  Dr. Mark LeVaughn

Dr. Mark LeVaughn testified over three dates about his autopsy (Docket Nos. 150 (March 8, 2018), 152 (March 9, 2018), 162 (May 18, 2018), Tr.; see Jt. Tr. Ex. 42 (autopsy report)).  In 2009, Dr. LeVaughn was the deputy chief medical examiner for Erie County and performed private autopsies for a fee (Docket No. 150, Tr. at 14-15).

He was contacted by either the family or an attorney on July 27, 2009, with a request to perform Southard's autopsy (id. at 16).  He performed the autopsy on that day (id. at 17-18), four months after the EVAR procedure (cf. Docket No. 162, Tr. at 44).

His testimony included reference to numerous autopsy photos that showed the poor condition of Southard's body at the time of his death.  There were multiple areas of erythema (reddening of the skin due to poor blood flow), surgical openings, and medical devices, including EKG pads, sutures, tracheostomy, IV tubes, feeding tube, drains, and catheter lines (e.g., Docket No. 150, Tr. at 20-29, 32).  There were sponges to soak up fluids and surgery scars in different states of healing, some of which appeared to be infected or healing poorly (e.g., id., Tr. at 40-42, 59-60).  The whole body looked like it had gone through a lot, with internal organs that looked like they were dying, including necrotic tissue on the pancreas and kidneys (Docket No. 152, Tr. at 14, 33).

Dr. LeVaughn also showed photos of the interior of the aorta and of the blockage of the renal arteries (id., Tr. at 35-38).  A clot covered the endovascular stent (id., Tr. at 41).  The pictures showed impressions on the interior walls of the aorta made by the suprarenal barbs on the stent graft (id., Tr. at 45, 56-61), **with no tearing or injury to the walls of the aorta** (id. Tr. at 60-61), suggesting that the stent had not moved.  On cross-examination, he admitted the autopsy was performed four months after the EVAR procedure and he could not rule out that an injury to the interior of the aorta would have healed in that time (Docket No. 162, Tr. at 44).

Dr. LeVaughn concluded that the cause of death was sepsis (Docket No. 150, Tr. at 76-77; Docket No. 152, Tr. at 71).  Blood loss from the renal bypass and a combination of all the other procedures that were undertaken to try to restore blood flow

46

allowed bacteria into the body that set off an inflammatory process that caused low blood flow and led to organ death (Docket No. 152, Tr. at 72-74).  One potential cause of the sepsis was the abscess that was present at the site of the retention stitches placed for the jejunectomy (id., Tr. at 75).  There are no bedsores or decubitus ulcers noted in the autopsy and Dr. LeVaughn does not recall seeing any (Docket No. 162, Tr. at 28-32).  Mr. Southard's narrow arteries, which were caused by heart disease unrelated to surgery, also contributed to death (Docket No. 150, Tr. at 71; Docket No. 152, Tr. at 77-78).

    2.  Dr. Barton Muhs

Plaintiff next called Dr. Barton Muhs on October 11, 2018, as her expert as to the appropriate standard of care (Docket No. 169, Tr.).  Plaintiff tendered Dr. Muhs as an expert in vascular surgery.  Dr. Muhs is a board-certified vascular surgeon (id., Tr. at 24).  After earning his medical degree from the University of Chicago in 1998, he completed a general surgery residency, followed by a vascular surgery fellowship, at New York University (id., Tr. at 4).  He was then competitively selected to become the Marco Polo Fellow by the Society of Vascular Surgery and was sent to study at Utrecht University in the Netherlands (id.).  There, he performed research in stent grafting (specifically, aortic) and obtained his Ph.D. (id., Tr. at 8-9).  In 2007, Dr. Muhs became the Director of Endovascular Surgery at Yale University (id., Tr. at 16).  He held that position until entering private practice in 2014 with the Vascular Experts, the largest private vascular surgery group in the United States (id., Tr. at 17-18).

While at Yale between 2007 and 2014, Dr. Muhs was a staff vascular surgeon at two VA hospitals in Manhattan and West Haven, Connecticut (id., Tr. at 18), performing

47

about 100 endovascular aneurysm repairs per year (which included 20-25 at the VA hospitals alone) (id., Tr. at 19).  He has used the Zenith Stent Graft in approximately 75 percent of all endovascular aneurysm repairs he has performed (id., Tr. at 26).

All parties agree that treatment of endovascular aneurysms is subject to a national standard of care (id., Tr. at 21, 23).  Dr. Muhs explained that the standard of care in 2009 demands a "suitable neck" to seal the stent graft (id., Tr. at 30, 36).  In his words: "the standard of care is never to cover the renal arteries during the deployment of a stent graft" unintentionally (he explained that sometimes, covering the renal arteries must be done intentionally in order to fix a ruptured aneurysm) (id., Tr. at 46).  In other words, any unintended coverage of the renal arteries in the deployment of a stent graft to treat an aneurysm violates the standard of care (see id.).  There is no dispute that Southard's renal arteries were covered after the deployment of the stent graft (id., Tr. at 48).  And nothing in the record indicates that this happened intentionally (id., Tr. at 46-47, 49).  He explained that Southard in particular "had perfect anatomy for an endovascular stent graft"—long, straight, no angles, no calcium, no thrombosis, and he lacked any of the typical anatomical risk factors for this procedure (id., Tr. at 48).

Dr. Muhs explained the various techniques that should be employed to ensure the standard of care is followed.  First, the stent graft must always be placed below the level of the lowest renal arteries (id., Tr. at 52).  To ensure this, Dr. Muhs marks the renal arteries on the screen, then deploys the stent graft precisely (down to the millimeter) (id., Tr. at 52-53).  Dr. Muhs would apply "redundant" techniques to make sure that the arteries are not covered, involving additional angiograms to confirm that nothing has changed (namely, that the table or C-Arm have not moved) (id., Tr. at 53).

Dr. Muhs said a single technique identifying where to deploy the stent is inadequate (id., Tr. at 54).  He explained that he performs multiple angiograms throughout the various depths of deployment of the Cook Zenith, to confirm the level of the renal arteries (id., Tr. at 65-66).  He usually performs four angiograms, claiming that number is normal "for most vascular surgeons" (id., Tr. at 77).  Dr. Muhs testified that in Southard's case only two angiograms were performed (id., Tr. at 69).

Dr. Muhs opined that the covering of renal arteries like Southard's occurred in one of two ways:  (1) the screen was marked incorrectly and covered the renal arteries, or (2) the screen was marked correctly, but then something moved (there is no indication in the record that anything moved) (id., Tr. at 54-55).  In either instance, the standard of care will be breached (id., Tr. at 55).  He emphasized that the standard of care also requires that eyes remain on the screen during deployment and between angiograms (id., Tr. at 67).  He also repeatedly emphasized the importance of locking down the C-Arm and the table **before** performing the angiogram (id., Tr. at 71-72).

When asked whether the stent graft could have been properly placed but then something "internally" happened to move the stent, Dr. Muhs quickly refuted that possibility, stating that it is "impossible for the stent graft to migrate upward" in a patient, like Southard, with the perfect anatomy (id., Tr. at 55).  Dr. Muhs testified that there could be no migration upward in a healthy anatomy like Mr. Southard's for an infrarenal endovascular aneurysm repair (id., Tr. at 55-56).  The Zenith Stent Graft is specifically designed to mitigate downward migration (because blood flow is naturally trying to pull the stent graft down) (id., Tr. at 59).  The two design features of the stent graft to mitigate against downward migration are (1) radial force, and (2) suprarenal struts (id.).

Given this design, there are only two or three causes for downward migration:  first, the stent graft is placed in a "bad neck," and therefore, blood flow will pull it down over time (id., Tr. at 62); second, normal blood flow from the heart downward to the feet causes drag on the stent (id., Tr. at 62-63), and third, the neck and aorta change over multiple years which would allow downward migration to occur (id., Tr. at 63).  Thus, the movement is driven by blood flow (id.).  When asked about upward migration of the Zenith Stent Graft, Dr. Muhs testified that he is unaware of any reports (including outside sources) of upward migration in the anatomy of someone like Southard (id., Tr. at 64-65).  He repeatedly emphasized that any upward migration intraoperatively is a direct result of operator error or deploying a stent graft in an unsuitable anatomic patient (id., Tr. at 89).

Dr. Muhs asserted that the attending vascular surgeon is responsible for making sure that the C-Arm and surgical table remain in place, although the locking of the C-Arm and ensuring stability for the table is delegated (id., Tr. at 72; see also id., Tr. at 86-87).  He reviewed the medical record and there was no indication that either the C-Arm or table moved, but Dr. Muhs stated that the table and C-Arm needed to be locked as "another safety check" (id., Tr. at 72).

On cross examination, Dr. Muhs was confronted with a 2009 practice guideline for the care of patients with abdominal aortic aneurysm, published by the Society for Vascular Surgery (id., Tr. at 129-30; Jt. Tr. Ex. 35, at 33).  This contained a statement that device migration after EVAR is multifactorial and can be asymptomatic; it also stated that device migration can occur intraoperatively or subsequent to device implementation—and is **not** limited to distal migration (as Dr. Muhs insisted it was)

(Docket No. 169, Tr. at 130-31).  He testified that he was not aware of any peer-reviewed literature that supported his opinion that once a stent graft has been placed and the suprarenal hooks have been deployed, the stent graft cannot move (especially upward) (id., Tr. at 109).  Dr. Muhs was aware of the literature regarding coverage of renal arteries but those cases arose either from operator error, installation in an "inadequate anatomy," or over the long term (id., Tr. at 110).  He admitted that he had not conducted any independent empirical research on proximal (i.e., upward, or retrograde) migration of stent grafts after suprarenal hooks have been placed (id., Tr. at 133).  Indeed, a bulk of the Government's cross examination was an attempt to undermine Dr. Muhs' expert report on the basis that he did not cite peer review articles or independent empirical research that supported his conclusions (see id., Tr. at 101-06).  Dr. Muhs defended his report as credible because it is based on his expertise, training, and experience in the field (id., Tr. at 147).

Plaintiff then rested her case (id., Tr. at 166).

3.  Dr. David Gillespie

Earlier, Plaintiff moved to preclude the testimony of Government's expert, Dr. David Gillespie (Docket No. 171).  This Court denied that motion in limine (Docket No. 176).

On November 14, 2018, the Government called Dr. Gillespie as its standard of care expert and final witness (Docket No. 182, Tr.).  Dr. Gillespie is a board-certified vascular surgeon, but styles himself as an "academic surgeon" (Docket No. 182, Tr. at 7-9, 11).  He received a bachelor's degree from Washington State University and a medical degree from the Uniformed Service University of the Health Sciences in

51

Bethesda, Maryland (id., Tr. at 7).  He then completed a five-year general surgery residency, followed by a two-year vascular surgery fellowship, at Boston University.  He became board certified in both general and vascular surgery sometime in the 1990s. (Id., Tr. at 7-9.)  Then, he spent 16 years at the Walter Reed Army Medical Center, where he ran the vascular surgery training program (id., Tr. at 11).  He became chief of vascular surgery and remained there until 2008, when he became the chief of vascular surgery at the University of Rochester (id., Tr. at 10-11).  In 2013, he joined South Coast Health in Massachusetts where he serves as the chief of vascular and endovascular surgery (id., Tr. at 9).  There, he performs one EVAR per month, and sometimes performs other endovascular aortic procedures; he also oversees ten vascular surgeons along with his two partners (id., Tr. at 10).  Dr. Gillespie worked on clinical trials for aortic aneurysm endograft, specifically with the Cook Zenith endograft (id., Tr. at 16).  Dr. Gillespie's preferred aortic endograft to use is the Zenith Stent Graft (id., Tr. at 18).

Dr. Gillespie has published extensively in the field of vascular surgery (approximately 150 to 200 publications) (id., Tr. at 9).  His extensive academic productivity has led him to become selected to be part of the Distinguished Fellows of the Society for Vascular Surgery (id., Tr. at 18).   He also currently holds the position of professor of surgery at the Uniformed Service University of the Health Sciences (id., Tr. at 12-13), training military vascular surgeons (id., Tr. at 13).  He has a patent on a fenestrated endograft (a more advanced endograft), approved in 2014 (id., Tr. at 17-18).

Much of Dr. Gillespie's expert report relied on the MAUDE (or manufacturers and users' data) database, which is a voluntary registry of reporting complications with

medical devices (id., Tr. at 22).  Dr. Gillespie conceded that the major flaw of this database is that there is no metric to measure how frequently these issues occur; rather, it is just a database comprised of individual, voluntary reports (id.).  The database simply reflects that complications with a medical device has occurred, but not how frequently it occurs in a specific device, nor the cause (id.).  MAUDE is considered at all because, as Dr. Gillespie noted, it was "all we have" (id., Tr. at 23).  Dr. Gillespie stopped short of calling the MAUDE database "reliable," instead stating that it is a reliable source to determine whether any complications from a device have occurred (id., Tr. at 29).  Ten out of twenty MAUDE reports Dr. Gillespie relied on discussed instances of proximal stent graft migration, but he admitted that the cases described in the MAUDE reports were arguably more complex than Southard's case, and none of the patients had the "perfect anatomy" that Southard had (id., Tr. at 79, 122).  Dr. Gillespie also repeatedly conceded that proximal migration happens most frequently in difficult anatomy (not in straightforward, healthy, normal anatomy like Southard's).  Dr. Gillespie denied using the MAUDE reports to suggest that proximal migration occurred with Mr. Southard because he had a different anatomy from those reported in MAUDE (id., Tr. at 122).  But he insisted, too, that it is not impossible for stent graft migration to migrate upward in healthy anatomy (contrary to Dr. Muhs' testimony).

Dr. Gillespie opined that the standard of care was satisfied in Southard's case (id., Tr. at 31).  That is because two angiograms were performed before the stent graft was performed (id., Tr. at 29-30, 31).  Dr. Gillespie then stated that the standard of care was (pursuant to the Cook Zenith instructions) for a "doctor . . . to perform arteriography to show the position of renal arteries in relation to the graft and to place the graft

53

accordingly and then perform a completion" (id., Tr. at 31).  He explained that the Cook

Zenith endograft instructions are not detailed, and simply instructs the user to place the

graft, take an angiogram, locate the renal arteries, and place the graft accordingly.  He

said there is no specific number of angiograms that should be performed (id.),

ostensibly rebutting Dr. Muhs' testimony that multiple angiograms were necessary.  To

be clear, Dr. Muhs did not say that performing multiple angiograms is required in order

to comply with the standard of care; he simply stated that he himself prefers to perform

multiple angiograms as a technique he uses to perform the procedure without breaching

the standard of care (see Docket No. 169, Muhs Tr. at 52).  Dr. Gillespie later admitted

that it is the doctors, not the device manufacturers and their instructions, that establish

the standard of care (Docket No. 182, Gillespie Tr. at 152).

       When asked whether the coverage of Southard's renal arteries occurred as a

result of the deviation of standard of care in 2009, Dr. Gillespie responded that he did

not know, and that the literature explains that renal arteries coverage can happen from

"several differential diagnoses" of six to seven different things, for example, the

endograft migrated on deployment of the top cap; the patient was anti-coagulated and

the graft was placed high, but the renal arteries looked open and later thrombosed; or

that torque buildup in the graft caused the graft to move after correct deployment (id.,

Tr. at 84-85).  When pressed, Dr. Gillespie pointed to one academic article, authored by

Nasim Hedayati, and others, published in the Journal of Vascular Surgery, Nasim

Hedayati et al., Prolonged Renal Artery Occlusion after Endovascular Aneurysm Repair:

Endovascular Rescue and Renal Function Salvage, 47 J. Vascular Surgery, Feb. 2008,

at 446 (hereinafter the "Hedayati article") (id., Tr. at 55-60, Jt. Tr. Ex. 95 (admitted into

evidence as a learned treatise); see Docket No. 219, Pl Reply to Gov't Proposed Findings of Fact Ex. ¶ 539), reporting two instances (Docket No. 182, Tr. at 61).  That article included an illustration of a patient with "dream anatomy" as with Southard, where the renal arteries went on to occlude postoperatively (id., Tr. at 63-64).  Mr. Southard's arteries occluded intraoperatively; Dr. Gillespie insisted that this is a distinction without a difference, and that the critical fact is that renal arteries coverage occurred at all in a case with dream anatomy (id., Tr. at 64-65).

The Hedayati article, however, fails to definitively identify the cause of the renal arteries coverage (id., Tr. at 66).  The article discussed possible causes, one of which was an upward force during the deployment of the stent graft might have pushed the entire device cranially, even though the stent graft was intentionally placed lower than the renal arteries (id., Tr. at 65-66; Jt. Tr. Ex. 95, Hedayati article at 448).  Other possible causes (reported in the MAUDE databases) are friction of the graft on insertion through the iliacs, deployment of the top cap, and movement forward (Docket No. 182, Tr. at 66-73).

At the end of direct testimony and upon this Court's questioning, Dr. Gillespie defined the standard of care as follows: "The standard of care with regard to aortic endografting of infrarenal aortas is to obtain proximal and distal seal of the aneurysm to prevent aortic rupture without causing further harm" (id., Tr. at 90).  This Court finds problematic, however, that Dr. Gillespie had to be pressed to opining this standard of care and he could not state whether there was a deviation from this standard of care presented here.

The Government then rested its case (id., Tr. at 176).

## V.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.  Liability

### 1.   Medical Malpractice

Plaintiff argues that the applicable standard of care is that the doctors verify that Mr. Southard had no risk factors in performing the EVAR (that is, Southard's arteries were suitable for the procedure); appropriate placement of the stent graft "by placing the sealing portion of the stent graft below the level of the renal arteries"; and the use of multiple redundant techniques to ensure the location of the renal arteries and proper positioning of the stent graft, including repeat angiography to confirm the location of those arteries and an angiograph taken prior to final deployment of the stent graft (see Docket No. 200, Pl. Proposed Conclusions of Law ¶ 50).  Plaintiff also lists prior consideration of the patient's medical history and use of scientific method in the patient's care and treatment (id.); those factors are not at issue in this case.  Plaintiff argues that Drs. Lall and Dosluoglu conceded that the resulting injuries and conditions—Southard's injuries and death—were due to the negligence of the Government (through its employees, agents, and representatives) (see Docket No. 200, Pl. Proposed Conclusions of Law ¶ 48).

The Government argues that the appropriate standard of care in this circumstance for performing a EVAR is "that the surgeon must ensure that the location of the renal arteries is known prior to deployment of the stent graft and that the stent graft is to be deployed below the level of the renal arteries" (Docket No. 196, Gov't Proposed Conclusions of Law ¶ 27; see Docket No. 197, Gov't Proposed Findings of Fact ¶ 566 (no specific number of angiograms to be performed)).

56

There are common points in both proposed standards of care.  This Court finds that the appropriate standard of care here is that the vascular surgeon (1) needs to know the precise location of the renal arteries before deployment of the stent graft, (2) deploys the stent graft below the renal arteries, and (3) ensures proper deployment by confirming the position of the arteries prior to deployment, ensuring that the patient, C-Arm, and operating table are not moved prior to siting the stent graft for deployment.  No one has argued a locality or statewide standard that differs from this national standard of care (see Docket No. 199, Pl. Proposed Findings of Fact ¶ 142).

Both parties' standards agree that the surgeon needed to know precisely where the renal arteries were prior to deployment of the stent graft and proper positioning of the stent graft.  How a surgeon determines the location of the arteries need not be specified as a matter of the standard of care.  Thus, this Court does not find that a specific technique or number of angiograms needed to be performed before deployment of the stent graft.  Furthermore, the manufacturer's instructions for deploying the stent graft (but cf. Docket No. 182, Gillespie Tr. at 31) are not part of the standard of care.

Applying applicable standard of care, the Government's physicians in the VAMC here **failed to meet that standard of care in treating Mr. Southard**.  The Government's surgeons either through unintentional operator error or the unintended movement of the operating table or C-Arm mis-located the renal arteries.  This Court accepts the expert testimony of Dr. Muhs (Docket No. 169, Muhs Tr. at 72, 86-87) that the attending vascular surgeon is responsible for making sure the C-Arm and operating table are secured, even if actual implementation is delegated to others in the operating room.

The parties debated (in the context of Dr. Muhs' testimony as to possible causation) whether there was evidence of either the C-Arm or operating table movement (compare Docket No. 196, Gov't Proposed Conclusions of Law ¶¶ 33-35 with Docket No. 218, Pl. Response to Gov't Conclusions of Law ¶¶ 45, 48, 54, 62).  The surgeons who performed the EVAR and later open procedure thought movement of the C-Arm or table was possible but did not know if in fact this equipment was moved (see Docket No. 207, Khan Tr. at 37; Docket No. 157, Lall Tr. at 168, 171-72; Docket No. 164, Lall Tr. at 91-92; see also Docket No. 151, Dosluoglu Tr. at 72).  This Court agrees with Plaintiff (Docket No. 218, Pl. Response ¶ 62) that Dr. Muhs was consistent in opining that the markings of reference were moved (either by the C-Arm or the operating table being moved) but finds this dispute is not material.  The dislocation of either the C-Arm or the operating table is not an intervening cause.  The attending vascular surgeon was responsible for the security of those devices as well as the proper deployment of the stent graft.  Thus, the last angiogram prior to deployment of the stent graft did not reflect the true location of the renal arteries when Dr. Khan deployed the stent graft.

By few millimeters, the stent graft was installed too high and covered the renal arteries and blocking blood flow, irreparably damaging the kidneys (see Docket No. 169, Muhs Tr. at 78-79), resulting in occlusion (Docket No. 157, Dr. Lall Tr. at 35-37; Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶ 231; Docket No. 150, Dr. LeVaughn Tr. at 60-61), and causing both kidneys to suffer hypoxia.  This left Mr. Southard in critical condition and in need of permanent dialysis and other medical interventions and consequences during his 118-day hospitalization (Docket No. 200, Pl.

Proposed Conclusions of Law ¶ 62).  The Government's expert and the VA doctors

concede that deployment of a stent graft unintentionally covering the renal arteries

violates the standard of care (see Docket No. 200, Pl. Proposed Conclusions of Law ¶

53).

The Government points to Dr. Gillespie's expert opinion that the actual cause of

the incident (whether it was operator error or movement of the C-Arm or the operating

table or other cause) has too many possible incidents and is unknowable, concluding

that no one cause can be identified (Docket No. 196, Def. Proposed Conclusions of Law

¶ 48; Docket No. 197, Def. Proposed Findings of Fact ¶¶ 536-37; Docket No. 182,

Gillespie Tr. at 38-40).  The purpose of expert testimony under Rule 702 is to assist this

Court as fact finder "to understand the evidence or to determine a fact in issue," Fed. R.

Evid. 702(a).  That an expert can find a myriad of causes and is unwilling to opine as to

which one might be **the** cause does not preclude this Court from finding a cause if the

evidence supports that result.

This Court finds that operator error caused the incorrect placement of the Cook

Zenith stent graft in Mr. Southard.  The stent graft was misplaced based upon not

knowing the precise and current location of Mr. Southard's renal arteries.  A confirming

angiogram or a secured operating table and C-Arm might have avoided this.  Ultimately,

installation of the stent in the wrong location breached the standard of care and caused

injury to Mr. Southard.  It is a factual question (ultimately unresolvable on this record)

what actually happened in that operating room to cause this mis-deployment.  This

Court is not rejecting the opinion of plaintiff's expert, Dr. Muhs, merely because he

recognizes the possibility of different causes for placement of the stent.  Dr. Gillespie for

the Government identified multiple possible causes without concluding upon any particular one.

Operator error thus could occur in two ways:  in placement of the stent graft in the wrong location or unintended movement of the C-Arm (the device with the angiogram that was supposed to locate the precise location of those arteries) or the operating table.  Defendant's surgeons are responsible for either operator error.  The applicable standard of care essentially is to find the correct spot below the renal arteries and install the stent there without covering those arteries.

This breach of the standard of care was the proximate cause of Southard's injuries.  Southard did not stand or sit up once he was in surgery on April 1, 2009, unlike the two patients noted in the vascular surgical literature cited by the Government (Jt. Tr. Ex., 95, Hedayati article, at 446, 447-48).  Southard had no risk factors precluding the EVAR procedure (see Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶¶ 119-20).  There is no evidence of stent graft failure or defect that caused its location. Occlusion of the renal arteries occurred due to operator error.  Mr. Southard endured 118 days of hospitalization, pain, sedation, infection, organ failure, and sepsis, as noted by Dr. LeVaughn in his autopsy (Docket No. 200, Pl. Proposed Conclusions of Law ¶ 17; Jt. Tr. Ex. 124) due to this error.  From Dr. LeVaughn's autopsy, Mr. Southard died from bacteria infecting him from the jejunectomy performed by VA doctors installing the feeding tube following the deployment of the stent graft; Southard was on dialysis and required a feeding tube.  These could not have occurred here absent the Government's negligence.

The Government points to its expert, Dr. Gillespie, and his review of the medical literature about the Cook Zenith graft, noting instances of stent migration as a possible cause for Southard's injuries (Docket No. 182, Tr. at 79-80).  This Court agrees with Plaintiff that the instances noted in the scholarly literature are distinguishable from the facts in this case.  In the literature, the stent was found to have relocated either days after deployment surgery and the patients having returned home (Jt. Tr. Ex. 95) or the patients had different anatomy than Mr. Southard's (see Docket No. 82, Gillespie Tr. at 80, 116); these anecdotal reports involved less optimal or less healthy arteries than Mr. Southard's allowing for upward migration over time.

Here, problems with the location of the stent graft arose during installation.  The Zenith Stent Graft was designed to prevent migration (Docket No. 157, Lall Tr. at 25; Docket No. 146, Dosluoglu Tr. at 85, 176-77; Docket No. 199, Pl. Proposed Findings of Fact ¶ 283).  All the doctors testifying this case have yet to experience intraoperative proximal migration with the Zenith Stent Graft (Docket No. 199, Pl. Proposed Findings of Fact ¶ 288).  Dr. LeVaughn's autopsy did not note signs of movement of the stent graft on the aortic wall to show that it changed position as might have happened in the journaled examples (see Docket No. 200, Pl. Proposed Conclusions of Law ¶ 16). Dr. Dosluoglu was unable to move the stent without tearing into the aorta wall (Docket No. 147, Dosluoglu Tr. at 36); had the stent migrated, the stent's previous location would have been indicated or other evidence of tearing to where the stent was found. Also, Mr. Southard's arteries did not have the abnormalities that would support a migration theory (Docket No. 199, Pl. Proposed Findings of Fact ¶ 287; see id. ¶ 286; Docket No. 200, Pl. Proposed Conclusions of Law ¶¶ 5-7).

Dr. Gillespie also points to MAUDE reports of instances of non-operator stent migration (Docket No. 182, Tr. at 22-23, 79).  At trial, this Court admitted testimony regarding the MAUDE reports but left for resolution the weight to be given to those reports (id., Tr. at 28).  Dr. Gillespie noted that it consists of voluntary reporting without knowing how many total cases are involved or whether there was redundant reporting of incidents (id., Tr. at 22-23).  It is flawed because it lacked any metric on frequency of incidents (id., Tr. at 22).  Dr. Gillespie conceded that MAUDE reports were not used to discuss incidence or prevalence, only to show that stent migration had occurred (id., Tr. at 116).  He also denied using the MAUDE reports to suggest that migration occurred in Mr. Southard (id.) because Mr. Southard had different anatomy (the "perfect" smooth neck) than the cases reported in MAUDE when stents migrated (id.).

The MAUDE reports are self-reporting by physicians and hospitals to manufacturers who then report these incidents to the Government (presumably to the Food and Drug Administration) (Docket No. 169, Muhs Tr. at 90).  Dr. Muhs said that these reports are not reviewed by clinicians, are "not in any way scientific," and are not used to determine the standard of care (id.), that this database also is not peer-reviewed (id., Tr. at 150).  These reports are from patients with abnormal, unusual, or unfavorable anatomies for endovascular procedure (id., Tr. at 150, 91; see also, Docket No. 182, Gillespie Tr. at 79, 104-16).

MAUDE reports thus are anecdotal.  These reports provide examples of complications but do not establish (or aid in this Court finding) the appropriate standard of care.  These reports also did not give an example similar to Mr. Southard's of a perfect anatomy with intraoperative migration of a stent graft.

Thus, the applicable standard of care was breached when the Government's doctors failed to place the stent graft in the proper location in Mr. Southard's arteries.

### 2.   Mr. Southard's Pain and Suffering

Mr. Southard endured pain and suffering from bedsores and hospital pneumonia. He was under constant sedation from his admission until placement in palliative care. Save when undergoing surgery and under more than local anesthesia, he was conscious during his hospitalization, but he was sedated throughout his entire stay.

The Government emphasizes that recovery here is dependent upon Mr. Southard's consciousness of his pain and suffering, that plaintiff has not shown that Mr. Southard experienced pain because of his sedation (Docket No. 196, Gov't Proposed Conclusions of Law ¶ 109; see also Docket No. 216, Gov't Response at 9). In Scullari v. United States, Nos. 99-6160(L), 99-6219(XAP), 2000 U.S. App. LEXIS 3416 (2d Cir. Feb. 24, 2000) (summary Order), the Second Circuit upheld a pain and suffering award reduced by the district court to $30,000 for sedation, recognizing under New York law that whether the patient was on pain medication was a factor in making a pain and suffering award, at *3-4.  There, the award was reduced due to sedation, not rejected in totality.  State cases cited by the Second Circuit there showed pain medication alleviated pain, id. at *4, citing Naughton v. Arden Hill Hosp., 215 A.D.2d 810, 813, 625 N.Y.S.2d 746, 748 (3d Dep't 1995), but did not eliminate a pain and suffering award.  The Second Circuit then noted that

> "any incentive that such a rule [allowing discount of pain and suffering award for pain medication] might create for medical providers to protect against large pain and suffering awards by sedating patients is counterbalanced by the risk that administering unneeded sedatives could expose these providers to malpractice liability,"

Scullari, supra, 2000 U.S. App. LEXIS 3416 at *5.  Thus, unlike the Government's

present argument, Plaintiff may be awarded for pain and suffering even if Mr. Southard

was under sedation.

Pain, even when managed, is still pain.  What is striking about this case is that

Mr. Southard remained on some form of sedation for the entirety of his 118 days in

VAMC and was on anxiety medication for about half of his stay.  Mr. Southard was not

fully conscious during periods of this hospitalization because of the sedation, but he was

not comatose during his hospitalization (see Docket No. 218, Pl. Response ¶ 152).

When he complained of pain or gestured or otherwise indicated to medical staff of his

pain, he was sedated.  Dr. Dosluoglu even testified that nurses at VAMC erred on the

side of giving pain medication to unresponsive patients (Docket No. 151, Tr. at 133).

The Government's contention is that Plaintiff could recover for pain and suffering

only if Southard was not receiving medication or was receiving insufficient medication

(see Docket No. 216, Gov't Response at 9).  While this would be a basis for recovery for

pain and suffering if a defendant either failed to administer or administered insufficient

painkillers, this is not the exclusive basis for recovery.  See Ramos v. City of N.Y.,

56 A.D.2d 763, 764, 392 N.Y.S.2d 291, 292 (1st Dep't 1977) (finding sufficient evidence

"that the decedent sustained an injury that, without sedation, would be productive of

pain," acknowledging that decedent was conscious and indicated her pain to her

husband in her tears and raising her arms toward him) (Docket No. 200, Pl. Proposed

Conclusions of Law ¶ 141); see also Ramos v. Shah, 293 A.D.2d 459, 740 N.Y.S.2d

376 (2d Dep't 2002) (Appellate Division found evidence of some level of consciousness

for plaintiff to prevail for pain and suffering) (Docket No. 200, Pl. Proposed Conclusions

of Law ¶ 180; Docket No. 216, Gov't Response at 10); <u>Cramer v. Benedictine Hosp.</u>, 301 A.D.2d 924, 930, 754 N.Y.S.2d 414, 419 (3d Dep't 2003) (decedent's estate awarded $300,000 for 6 days pain and suffering despite being in coma during other portions of hospitalization) (Docket No. 216, Gov't Response at 10; Docket No. 200, Pl. Proposed Conclusion of Law ¶ 184).  The <u>Ramos</u> cases are instructive on the potential for pain and suffering recovery despite the plaintiff or decedent being under sedation or (in <u>Ramos v. Shah</u> or <u>Cramer</u>) comatose.

In <u>McDougald v. Garber</u>, 73 N.Y.2d 246, 255, 538 N.Y.S.2d 937, 940 (1989), plaintiff Emma McDougald had a Caesarian section and went into a coma.  Defendants there argued that the plaintiff's injuries were so severe that she was incapable of experiencing pain; plaintiffs introduced proof that plaintiff Emma McDougald responded to stimuli, 73 N.Y.2d at 252, 538 N.Y.S.2d at 939.  The New York Court of Appeals affirmed the reduction and restructuring of plaintiffs' separate awards for pain and suffering and loss of enjoyment in life totaling $4.5 million into a pain and suffering award of $2 million.  The court adopted a "some level of awareness" standard from pain and suffering for plaintiffs' recovery, <u>id.</u>, 73 N.Y.2d at 254, 538 N.Y.S.2d at 940.

Plaintiff still recovers for Mr. Southard's pain and suffering even if that pain was managed by the Government's agents at the VAMC.  This recovery would differ from one if Mr. Southard received no pain medication or insufficient pain medication.

Therefore, this Court finds that **Mr. Southard endured <u>conscious</u> pain and suffering** that the Government is responsible for.

B.  Damages

As the Government is found liable, Plaintiff is "entitled to recover a sum of money which will justify and fairly compensate him for the injury and for the conscious pain and suffering to date," IB N.Y. PJI § 2:280, at 879 (2015) (Docket No. 88, Gov't Trial Br. ¶ 107); see also IB N.Y. PJI § 2:280, at 925 (2020).  Damages are recoverable for lost earnings, medical expenses, and damages for pain and suffering, Ulrich v. Veterans Admin. Hosp., 853 F.2d 1078, 1082 (2d Cir. 1989) (id. ¶ 109).

1.  Wrongful Death

Applying the elements for a wrongful death claim in New York, Plaintiff here has established the death of Mr. Southard was due to the negligence of the Government, the survival of distributees (Southard's children), and her appointment as his representative, see Garcia, supra, 43 F. Supp. 3d at 298-99; N.Y. Est. Powers & Trusts L. § 5.4-3.  At issue is the element of the pecuniary loss of those distributees due to Mr. Southard's death, Garcia, supra, 43 F. Supp. 3d at 299; N.Y. Est. Powers & Trusts L. § 5.4-3.

On November 14, 2018, the last day of testimony, Plaintiff sought this Court take judicial notice of life expectancy tables for white males of Mr. Southard's age (Docket No. 182, Tr. at 5, 178; Jt. Tr. Ex. 149).  Plaintiff argued that Mr. Southard would have had a life expectancy of 84 years hence living for another eighteen years after 2009 (Jt. Tr. Ex. 149; Docket No. 205, Pl. Proposed [Corrected] Findings of Fact ¶¶ 568, 569 (National Vital Statistics Report)).

The Government objected on relevance grounds (Docket No. 182, Tr. at 5, 178-79), arguing that since Mr. Southard has no economic loss claim his life expectancy was

66

irrelevant (id., Tr. at 178-79).  Plaintiff replied that life expectancy would go to Southard's pain and suffering and his knowledge that he would not live a normal lifespan (id., Tr. at 178).  This Court then ordered parties to brief this issue (id., Tr. at 179; see Docket No. 184).  On March 8, 2019, the Government noted that Plaintiff had not submitted a brief on the admissibility of the statistical report, concluding that Plaintiff waived any argument for admission of that report (Docket No. 185).  After her motions for nunc pro tunc extension of time to submit (Docket Nos. 186, 187, 188), Plaintiff filed her argument supporting admission of the report (Docket No. 190), to which the Government filed its opposition (Docket No. 191).  During a status conference on March 13, 2019, this Court issued a bench statement admitting the statistical report into evidence (Docket No. 192, minute entry; see also Docket No. 193, Third Am. Jt. Exhibit List, at 24, noting admission of Ex. No. 149).

The Government now merely responds that Plaintiff mischaracterized the National Vital Statistics Report (Docket No. 217, Gov't Objections to Plaintiff's Propose Findings of Facts at 28, responding to Pl. ¶ 570), but not addressing the previous paragraph and its reference to that same National Vital Statistics Report.

Under Federal Rule of Evidence 201(c), this Court must take judicial notice if a party requests it and the Court is supplied with the necessary information, Fed. R. Evid. R. 201(c)(2), and may do so at any stage in the proceeding, id. R. 201(d).  Facts that may be noticed are those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," id., R. 201(b)(2).  (See also Docket No. 190, Pl. Memo. re admissibility of Ex. 149, at 2 (report also self-authenticating under Rule 902(5).)

Here, the issue is the relevance of that report.   As was stated in the Bench Statement of March 13, 2019 (see Docket No. 192), this Court held that the report was irrelevant to determination of Mr. Southard's pain and suffering damages but was relevant in Plaintiff's action for wrongful death.   To that end, "life [expectancy] tables are generally admissible on a limited basis in wrongful death or damage actions for consideration of the probabilities of damage over a period of years."   Cont'l Cas. Co. v. Jackson, 400 F.2d 285, 293 (8th Cir. 1968); see also Peterson v. United New York Sandy Hook Pilots Ass'n, 17 F. Supp. 676 (E.D.N.Y. 1936) ("In fixing award, as to widow, under wrongful death statute, mortality tables may be consulted.").   Indeed, the Government's opposition filing conceded that, "in computing the amount of damage for wrongful death, annuity and mortality tables may be considered" given that life expectancy is one factor to be considered in a wrongful death claim.   (Docket No. 191, Gov't Br. at 4.)   This Court then found that the Government's opposition to admission was misplaced.   While the extent of the pecuniary damages at issue ultimately might be de minimis, that is a matter for the Court to resolve now after it has considered all of the evidence admitted at trial, assessed the credibility of the witnesses, and reviewed the parties' post-trial submissions. The Government took the opportunity to challenge the amount and extent of damages in this case in its post-trial Findings of Fact and Conclusions of Law.

The Government's latest submissions, however, do not address Plaintiff's wrongful death damage claim save arguing that the statistical report was mischaracterized (cf. Docket No. 217, Gov't Objections to Plaintiff's Propose Findings of Facts at 28) without stating the basis for the mischaracterization.   Plaintiff argued this damage claim with the decedents' claims for Mr. Southard's expected guidance and counseling they would have

received but for his demise (see Docket No. 190, Pl. Memo. re admissibility of Ex. 149, at 4), as well as Mr. Southard's pain and suffering (id.), which this Court later rejected (see Docket No. 192).

Wrongful death damages do not include those "which could have been recovered in a personal injury action had the decedent survived," Parilis, supra, 49 N.Y.2d at 985, 429 N.Y.S.2d at 166; Liff, supra, 49 N.Y.2d at 633, 427 N.Y.S.2d at 749.  As the New York Court of Appeals held in Liff, "the wrongful death statute created a new cause of action based not upon damage to the estate of the deceased because of death, but rather for the pecuniary injury to the surviving spouse and next of kin of the decedent," Liff, supra, 49 N.Y.2d at 632-33, 427 N.Y.S.2d at 749; a decedent thus "has no cause of action to recover damages for his death (EPTL 11-3.3)," id.  There is no cause of action for Mr. Southard's shortened lifespan.  The only claim is from the loss to his decedents for pecuniary benefits they would have received had he lived his anticipated lifespan.

Here, even if Mr. Southard's losses were considered, the Government points out that in 2009 his income was limited to Social Security disability, VA benefits, and food stamps (Docket No. 191, Gov't Memo. at 6, Ex. E, Docket No. 153, Pl. Tr., Mar. 14, 2018, at 71) and payments for odd jobs (Docket No. 205, Pl. [Corrected] Findings of Fact ¶ 75; Docket No. 218, Pl. Response to Gov't Conclusion of Law ¶ 179).  Plaintiff denied that Mr. Southard had a loss of income claim (see Docket No. 153, Pl. Tr. at 71-72; Docket No. 182, Tr. of Nov. 14, 2018, at 178).  The Government concludes that Southard was not able to provide financial support to his children in the future and thus any wrongful death claim should be denied (Docket No. 182, Tr. of Nov. 14, 2018, at 178).

Plaintiff's proffered statistical report only states how long Mr. Southard was expected to live and not his decedent's projected pecuniary losses for the projected eighteen years that he did not live.   The issue is the amount of pecuniary losses his distributees, his sons and daughter, incurred and Plaintiff's claim for the distributees' losses of guidance and counsel and pecuniary damages are addressed below.   The effect of this statistical report, as Plaintiff argued (Docket No. 190, Pl. Memo. at 4), is to provide temporal parameters for the distributees' pecuniary loss claims, where the life expectancy of the decedent is one of several factors, see McKee, supra, 849 F.2d at 52.   As a distinct damage claim, the statistical report alone fails to establish a wrongful death claim.

2.   Pain and Suffering

Plaintiff alleges that Mr. Southard suffered pain and suffering for 118 days prior to his death, from April 1 to July 27, 2009 (see Docket No. 92, Pl. Trial Br. at 21).   She also seeks to recover for his wrongful death.

a.   Applicable Standards

Pain and suffering under New York law encompasses recovery for physical pain, adverse emotional consequences attributable to that pain, and the loss of enjoyment of life, McDougald, supra, 73 N.Y.2d at 254-55, 538 N.Y.S.2d at 939-40 (Docket No. 88, Gov't Trial Br. ¶ 110).   This Court, as trier of fact, has to determine the value of Mr. Southard's pain and suffering from all the evidence presented, Kolerski v. U.S., No. 06CV422, 2008 WL 4238924, at *4 (W.D.N.Y. Sept. 8, 2008) (Skretny, J.) (id. ¶ 111). New York law limits pain and suffering to a victim's consciousness of the pain, see Haque v. Daddazio, 84 A.D.3d 940, 922 N.Y.S.2d 548 (2d Dep't 2011) (id. ¶ 113). According to the pertinent New York Pattern Jury Instructions, "conscious pain and

suffering means pain and suffering of which there was some level of awareness by plaintiff (decedent)," 1B N.Y. PJI 2:280 at 925 (emphasis added). As this Court held in Kolerski, supra, 2008 WL 4238924, at *5, "when determining a pain and suffering award, it is appropriate for the Court to review awards in comparable cases."  (Id. ¶ 119.)  New York law also recognizes a maximum for pain and suffering, id. at *7 (discussing Huthmacher v. Dunlop Tire Corp., 309 A.D.2d 1175, 765 N.Y.S.2d 111 (4th Dep't 2003)[6] (vacating a $1 million pain and suffering award for plaintiff in hospital for 69 days but comatose for all but 10 days, remanding for new trial on damages)).

### b.  Government's Contentions

The Government argues that plaintiff failed to prove Mr. Southard's pain and suffering and that Plaintiff's expert, Dr. Muhs, did not opine regarding Mr. Southard's pain management following surgery (Docket No. 196, Gov't Proposed Conclusions of Law ¶¶ 107-08; see Docket No. 169, Muhs Tr. at 143 (Dr. Muhs did not form an opinion as to effectiveness of pain management)).  When he complained of pain, Mr. Southard was treated with Hydromorphone, Versed, and Fentanyl, the last a potent opioid anesthetic (Docket No. 196, Gov't Proposed Conclusions of Law ¶ 113).  When he became agitated or manifested anxiety or restlessness, Mr. Southard was medicated (id. ¶ 116).  The Government claims that he did not suffer conscious pain between April 1 and 24 and July 23-27, with Mr. Southard in palliative care and resting comfortably for the latter period (id. ¶ 117).  The Government contends that Mr. Southard's pain was under control between April 25 and July 22 (id. ¶¶ 119-22).  To be actionable, Mr. Southard had to be conscious of the pain; the Government alternatively contends that

---

[6]Following that decision, the plaintiffs settled their claims for $5 million, Huthmacher v. Dunlop Tire Corp. 28 A.D.3d 1166, 1167, 815 N.Y.S.2d 385, 386 (4th Dep't 2006).

Southard was not aware of the severity of his condition until July 22 when aggressive treatment was discontinued and hours before palliative treatment began (id. ¶¶ 129-30).

### c.  Comparable Cases

The Government distinguishes one of Plaintiff's comparable cases, this Court's decision in Kolerski in which the plaintiff there was awarded $400,000 for that decedent enduring about twenty days of pain and suffering, Kolerski, supra, 2008 WL 4238924, at *7 (id. ¶¶ 132-33).  In Kolerski, this Court relied upon Arias v. State of New York, 8 Misc.3d 736, 795 N.Y.S.2d 855 (Ct. of Claims 2005), aff'd, 33 A.D.3d 951, 822 N.Y.S.2d 727 (2d Dep't 2006), concluding that the facts were similar, Kolerski, supra, 2008 WL 4238924, at *5-7 (id. ¶ 134).

The Government also distinguished other cases cited by Plaintiff as comparable that did not discuss the pain management for the decedents there (Docket No. 216, Gov't Response at 7-8, 9 (distinguishing Mancuso v. Kaleida Health, 172 A.D.3d 1931, 100 N.Y.S.3d 469 (4th Dep't), aff'd, 34 N.Y.3d 1020, 114 N.Y.S.3d 502 (2019); Nelson v. New York City Health & Hosps. Corp., 237 A.D.2d 189, 654 N.Y.S.2d 378 (1st Dep't 1989); Kogan v. Dreifuss, 174 A.D.2d 607, 571 N.Y.S.2d 314 (2d Dep't 1991)); but cf. Docket No. 200, Pl. Proposed Conclusions of Law ¶¶ 158-61, 173, 177).  Mancuso only has a result that is pertinent to this case.  There,

> "decedent developed rhabdomyolysis of her entire body.  She became progressively weaker as her muscles broke down; she could not lift her arms, then could not walk, then could not keep her head up and lost bladder control.  Her kidneys failed and she underwent dialysis.  As her condition worsened, besides the increasing pain she felt, she was also aware that she was dying.  Decedent began having symptoms of rhabdomyolysis around September 4th, and she died on October 10th, meaning that she had pain, suffering, and thoughts of her impending death for a month."

172 A.D.3d at 1936, 100 N.Y.S.3d at 474.   Rhabdomyolysis, a side effect of the medication prescribed by defendants, is a breakdown of muscles and resulting kidney damage, id., 172 A.D.2d at 1932, 100 N.YS.3d at 471.  The Appellate Division upheld the damage award of $1,000,000 for 81-year-old decedent's pain and suffering, fear of death and/or pre-death terror for a month, id. at 1936, 1931-32, 100 N.Y.S.3d at 474, 471.

Determining what is the reasonable amount to compensate for conscious pain and suffering requires comparison of cases, Kolerski, supra, 2008 WL 4238924, at *5. As Plaintiff notes (Docket No. 200, Pl. Proposed Conclusions of Law ¶ 146), there are no cases that are on fours with the facts of Mr. Southard's hospitalization and death (see also Docket No. 218, Pl. Response ¶¶ 146, 154).  Plaintiff also notes that the Government has not provided its list of comparable cases (see id. at pages 47-50). Cases cited by Plaintiff and discussed by the Government did not involve hospitalization for over 100 days leading to the patient's death (see id. ¶¶ 146-63).  This Court has not found temporally comparable cases from New York courts or federal courts applying New York law.  The Government distinguishes the cases cited by Plaintiff for different reasons (Docket No. 216, Gov't Response at 6-11).

This Court, however, requires some basis to determine the reasonable damage award.  This Court reviewed the cases cited by the parties and other New York State and federal cases applying New York tort law to compare with the facts presented in this case, see, e.g., McDougald, supra, 73 N.Y.2d at 254, 538 N.Y.S.2d at 940 (affirmed reduction of $4.5 million to pain and suffering award of $2 million for plaintiff with some level of awareness of her pain); Ramos v. Shah, supra, 293 A.D.2d at 459-60, 740 N.Y.S.2d at 378 (ordering plaintiff to enter a stipulation to an award of only $450,000 or

73

have a retrial, holding that the damage award of $900,000 was excessive); Cramer,

supra, 301 A.D.2d at 930, 754 N.Y.S.2d at 419 (reducing original verdict of $1 million to

$350,000 for 6 days of conscious pain and suffering); Kogan, supra, 174 A.D.2d at 610,

571 N.Y.S.2d at 316 (parties to stipulate to reduce conscious pain and suffering award

from $1.05 million to $350,000 or else have a new trial on damages for infant

decedent's conscious pain for over 50 hours).

        In Arias v. New York, 8 Misc.3d 736, 795 N.Y.S.2d 855 (Ct. Cl. 2005), the court

awarded that claimant $350,000 for the conscious pain and suffering of a prisoner

decedent hospitalized for 13 days who ultimately died.  He was sedated and/or

unresponsive during periods of the hospitalization and endured invasive procedures

(intubation, catheterizations, tracheotomy) with the court noting that "each of these were

a source of discomfort/pain regardless of local anesthesia administered," 8 Misc.3d at

740, 795 N.Y.S.2d at 858.  Plaintiff's medical expert reviewed the medical record

concluding that decedent was in pain, 8 Misc. 3d at 739, 795 N.Y.S.2d at 857-58.  The

Appellate Division affirmed the award against claimant's challenge that it was

inadequate, holding that the amount awarded for conscious pain and suffering "did not

deviate from what would be considered reasonable compensation for this element of

damages," 33 A.D.3d 951, 951, 822 N.Y.S.2d 727, 728 (2d Dep't 2006).

        This is similar to Mr. Southard's treatment.  In this case, Mr. Southard had a

Perma-Cath installed and later exchanged, he was intubated with a tracheostomy, and

had a jejunostomy, among the procedures he endured, with discomfort and pain noted

during or after each procedure (Docket No. 205, Pl. [Corrected] Proposed Findings of

Fact ¶ 311; Jt. Tr. Ex. 42 (autopsy report); see Docket No. 197, Gov't Proposed Findings of Fact ¶¶ 148, 154, 157).

In Ramos v. City of New York, supra, 56 A.D.2d at 764, 392 N.Y.S.2d at 292, the court held that plaintiff alleged a prima facie case for conscious pain and suffering but plaintiff had to agree to enter into a stipulation reducing the damage award to $110,000 for wrongful death and for conscious pain and suffering or face a new trial, id. at 764, 392 N.Y.S.2d at 292.

This Court, in Kolerski, supra, 2008 WL 4238924, cited Arias, MacDougald, and Ramos v. Shah, supra, 293 A.D.2d 459, 740 N.Y.S.2d 376, as comparison cases for Mr. Heath's injuries, awarding Kolerski and other of Heath's heirs $400,000 for the pain and suffering from invasive procedures (leg amputation), restraints upon Heath when agitated.  This award was granted despite his sedation and at times being unresponsive while hospitalized, finding decedent Heath's case similar to Arias, Kolerski, supra, 2008 WL 4238924, at *7.  Mr. Heath was in the hospital, and aware of his impending death, from his cancer diagnosis on June 18, 2004, to his death on July 9, 2004, for 21 days, id. at *1-2, 4.

This Court's decision in Kolerski, despite its briefer hospital stay and more physical restraints imposed upon Heath, is like Mr. Southard's treatment in this case. Both  decedents endured invasive procedures and were sedated and at times unresponsive during their respective hospital stays, Kolerski, supra, 2008 WL 4238924, at *6.  Thus, both Arias and Kolerski are instructive for the consideration of Mr. Southard's pain and suffering, see id.

Acknowledging that each case is fact specific, the common trends revealed in these cases are that if the decedent had any level of consciousness (despite sedation) and suffered prior to losing consciousness or death, New York courts have awarded pain and suffering damages.  This Court thus finds the decisions in Kolerski, Arias, Mancuso,[7] are informative in quantifying the pain and suffering Mr. Southard endured for the 118 days of his hospitalization (despite Mancuso post-dating Southard's hospitalization).  Again, none of these cases had pain and suffering claimed as long as Southard did.  Taking the pain and suffering awards from those three cases (Kolerski, $400,000 in 2008; Arias, $350,000 in 2005; and Mancuso, $1,000,000 in 2019) and dividing the number of days those decedents had conscious pain and suffering one can arrive at a daily average for the damage award (Kolerski, $20,000; Arias, $27,000; and Mancuso, $33,333).  That average can be extrapolated over a longer hospitalization to determine the reasonable compensation for Mr. Southard.  That reasonable compensation is a daily rate applicable would be roughly the combined average of Kolerski, Arias, and Mancuso awards, or **$30,000** per day, factoring in the extensive duration of Southard's hospitalization as compared with these comparable cases.

The next issues are whether Plaintiff has sufficiently established that Mr. Southard suffered conscious pain and suffering and the duration of that conscious suffering.

---

[7]Kolerski, supra, 2008 WL 4238924; Arias, supra, 8 Misc.3d 736, 795 N.Y.S.2d 855, aff'd, 33 A.D.3d 951, 822 N.Y.S.2d 727; Mancuso, supra, 172 A.D.3d 1931, 100 N.Y.S.3d 469; see also Ramos v. Shah, supra, 293 A.D.2d 459, 740 N.Y.S.2d 376; Ramos v. N.Y.C., supra, 56 A.D.2d 763, 392 N.Y.S.2d 291.

d.  Use of Expert Testimony

The Government also argues that Plaintiff has failed to prove Mr. Southard's pain and suffering because she did not introduce a medical expert to discuss that or factor any mitigation from his sedation and pain management (Docket No. 196, Gov't Proposed Conclusions of Law ¶¶ 107-08, 133; Docket No. 216, Gov't Response at 9, 10 (distinguishing cases in which experts were produced)).  This Court notes that the Government also did not introduce expert testimony on sedation to mitigate any claim to pain and suffering damages.  The Government's medical expert, Dr. Gillespie, was produced as a standard of care expert for EVAR procedures (cf. Docket No. 182).

In Jones v. Methodist Hospital, No. 2001-1606 K C, 2003 WL 1971809 (N.Y. App. Term 2d and 11th Jud. Dists., Feb. 14, 2003), a 75-year-old terminal cancer patient had a sponge left in him following surgery, requiring an immediate follow up surgery to remove it and continued sedation.  In his estate's medical malpractice action for negligently leaving the sponge, it was unclear whether decedent had "an increment in conscious pain and suffering or an aggravation of plaintiff's condition abbreviating his conscious lifetime, proximately and solely attributable to the additional procedure to remove the sponge" requiring expert testimony, id., at *1.  Decedent had brief periods of post-operative consciousness while under heavy sedation and died of an unrelated terminal illness less than two weeks after the operation, id.  The Appellate Term determined that "on the facts of this case, in the absence of any expert testimony, any assessment of damages thereon would have been impermissibly speculative," id., 2003 WL 1971809, at *1.

The case at bar is readily distinguishable from <u>Jones</u> and its apparent expert mandate.  Mr. Southard did not have other potential medical causes for his demise or for any pain suffered that would require an expert to assist this Court in discerning the source of his discomfort.  Southard also was hospitalized far longer than decedent in <u>Jones</u>.

Again, Federal Rule of Evidence 702 allows for the admission of expert opinions where they would "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a); that rule does not require expert evidence.  Differing, for example, from <u>Jones</u>, <u>supra</u>, and proof of medical malpractice itself, <u>cf.</u> <u>Milano</u>, <u>supra</u>, 64 F.3d at 91, a medical expert is not needed to comprehend the pain Mr. Southard endured.  Cases cited by both sides and found by this Court introduced medical expert opinions supporting or refuting pain and suffering claims, <u>e.g.</u>, <u>Arias</u>, <u>supra</u>, 8 Misc. 3d at 737, 795 N.Y.S.2d at 856; <u>Ramos v. Shah</u>, <u>supra</u>, 293 A.D.2d at 460, 740 N.Y.S.2d at 377 (expert on effects of dehydration on the decedent; court also citing lay opinion of decedent's father and his observations of decedent's pain); <u>see also</u> <u>Kogan</u>, <u>supra</u>, 174 A.D.2d at 610, 571 N.Y.S.2d at 316 (expert testimony as to causation), but New York law does not require the use of experts to prove pain and suffering.  Note, <u>Kolerski</u> did not have medical experts testify as to decedent's pain and suffering (and defendant did not call any witnesses), <u>cf.</u> 2008 WL 4238924, at *1.

This Court, however, has the observations of lay witnesses (Southard's family members) as well as the medical record.  Witnesses testified their impressions that Southard was in pain for the duration of his hospitalization.  Mr. Southard was under constant sedation for the duration of his hospitalization, despite notations that he had a

pain score of "0" or "99" and was resting comfortably.  The reason for that sedation (under Versed, Hydromorphone or Dilaudid, and Fentanyl for pain and Lorazepam for anxiety) was installation and use of a trach tube for the duration of Southard's hospitalization (Docket No. 172, Lall Tr. at 14).  He endured invasive procedures from the EVAR to installation of a Perma-Cath for his dialysis and was sedated for each surgical procedure.  He had pressure sores and sepsis (Docket No. 157, Tr. at 156 (Dr. Lall); see Docket No. 218, Pl. Response ¶ 148) and hospital-acquired pneumonia (Docket No. 157, Tr. at 158-59 (Dr. Lall)).  He never stood, sat up, or walked after admission to VAMC.

Therefore, Plaintiff has established that Mr. Southard suffered pain and recovers for Mr. Southard's conscious pain and suffering despite that pain being eased by sedatives and, in his final days, by palliative care.

### e.  Pain and Suffering Damages

The next issue is how long was Mr. Southard in conscious pain.  Mr. Southard's pain and suffering can be divided by when it occurred; there is the pain and suffering for much of Mr. Southard's hospitalization and the period about a week before his death when he was also aware of his possible passing and palliative care was administered.

### 1)  Pain During Hospitalization

Mr. Southard was conscious save during his operations.  Due to the intubation of a trach tube, he had physical difficulty speaking.  Southard was sedated every day during his hospitalization for installation and use of a trach tube (see Docket No. 172, Lall Tr. at 14), during operations, for palliative care his final few days, and the days between.  He also received antidepressants as he became anxious about his situation.

The VAMC recorded pain for Southard as 0 or 99 when he could not express his level of pain; these notations only indicate he was conscious but nonresponsive (see Docket No. 164, Lall Tr. at 121).  On the other hand, the testimony indicated periods when Southard was responsive enough for staff to rate his level of pain and discomfort.  For example, on May 8, Southard complained of pain on the level of 8 on a 0-10 pain scale (Docket No. 157, Lall Tr. at 147) while on May 18 he registered pain on a 5 on the same 0-10 scale (id., Lall Tr. at 92; cf. Docket No. 197, Gov't Proposed Findings of Fact ¶ 151).

This Court finds that that Plaintiff established Mr. Southard consciously suffered pain (or received sedation) for **58 days** (excluding palliative care).  This is from days when Mr. Southard was in surgical procedures and under anesthesia and when he indicated that he was feeling pain or was agitated.  Excluded are days when his medical record indicated that he was alert and did not indicate pain, despite being under constant sedation.

With Southard enduring varying levels of pain and consciousness, a reasonable way to determine damages is the cumulative amount rather than attempt to specify the level of pain (or damages therefrom) endured on any one day.  Of the 58 days hospitalized in conscious pain and suffering before July 22, 2009 (when invasive care ceased and palliative care began), Mr. Southard's pain and suffering damages total **$1,740,000.00** based upon the average of the damage awards upheld by New York courts (or this Court in Kolerski applying New York damages law) as stated above at **$30,000** per day.

2)  Impending Death

On July 16, 2009, Mr. Southard was told that if his dialysis were stopped, he would not survive.  He was shocked when he learned the extent of his condition.  (See Docket No. 197, Gov't Proposed Findings of Fact ¶ 177; Jt. Tr. Ex. 113, at 6015-17.) He was aware that his survival depended upon continued dialysis despite his discomfort while on that machine.  Tona testified that on July 17 Southard (in a meeting with the family and VAMC staff) said he no longer wished life support and the medical staff explained that if dialysis discontinued, Southard would die (Docket No. 156, Tona Tr. at 90-92; Jt. Tr. Ex. 113, at 5997).  On July 22, 2009, Mr. Southard's family had a series of meetings with hospital staff regarding the next phase of his treatment.  Mr. Southard was included in the last meeting on July 22 when the decision was reached to end dialysis once he was informed that his condition would not improve.  Depressed and tired of dialysis, he agreed to end treatment aware of his fate.

Mr. Southard then had from July 16 (when he realized his dialysis dependence) through July 22 (when the dialysis and other invasive devices were removed) until his death on July 27 to contemplate his impending death.

Similar to the comparative process used above for Mr. Southard's physical pain and suffering generally, this Court reviewed comparable New York cases considering decedent's apprehension of impending death.  Most of these cases usually involve death with a short period between injury and passing, cf. Ramos v. Shah, supra, 293 A.D.2d at 460, 740 N.Y.S.2d at 377 (decedent apprehended impending death for several days, but award does not distinguish impending death).  But in Mancuso, supra, 172 A.D.3d at 1931-32, 1936, 100 N.Y.S.3d at 471, 474, decedent began to suffer

symptoms of the disease that claimed her life and lingered in a hospital for about

36 days prior to her death and her estate was awarded $1 million, with the court

including in that damages for her thoughts of her impending death.  In <u>Mann v. United

States</u>, 300 F. Supp. 3d 411, 418, 420-21 (N.D.N.Y. 2018), the decedent lived for

twenty months after a cancer diagnosis, enduring the mental anguish of his impending

death.  Comparing comparable cases under New York law, the Northern District of New

York in <u>Mann</u> awarded $1.25 million to decedent's estate for that conscious pain and

suffering, <u>id.</u> at 421, 424, without distinguishing his mental anguish for his impending

death.

In <u>Hyung Kee Lee</u>, <u>supra</u>, 118 A.D.3d at 753, 987 N.Y.S.2d at 440, decedent

suffered for three and a half days with an untreated gallbladder, including hours of

sensing his impending death.  The Appellate Division held that the jury verdict of

$3,750,000 for conscious pain and suffering (including impending death) did not deviate

materially from reasonable compensation, <u>id.</u>

An analogous situation occurred with the near-death experience of plaintiff in

<u>Zambrana v. Central Pathology Services, P.C.</u>, 51 Misc.3d 1223(A), 41 N.Y.S.3d 453

(table), 2016 WL 2977363 (Sup. Ct. Richmond County 2016).  Defendants

misdiagnosed plaintiff's biopsy and concluded she had a rare form of cancer, leading

her to seek chemotherapy for eight months until a correct diagnosis and detection of the

mixed biopsies.  The court found for plaintiff and awarded $1,200,000 (upon stipulation)

for past pain and suffering, 2016 WL 2977363, at *5.  This court analogized plaintiff's

recovery to apprehension of impending death, because she has spent "horrible eight

months believing she would die," <u>id.</u>, at *5 & n.8.

Here, Mr. Southard was aware of his impending death from around July 16, when he sought termination of dialysis and was told that withdrawal of care would lead to his demise.  He said that he was "floored" upon learning his fate (Jt. Tr. Ex. 113, Southard's medical records at page 6019; Docket No. 197, Gov't Proposed Findings of Fact ¶ 177). He seemed to understand the severity of his situation for the first time that day (id.). The VAMC ethicist who met with Southard that day noted that he was upset by this news and did not ask about his resuscitation instructions that day (id.).  This Court finds that Mr. Southard then was sufficiently conscious of his situation and impending death, from July 16, 2009, for **eleven days** until he died on July 27, 2009.  From July 16 to 22, 2009, when Mr. Southard was placed into palliative care on July 22, he endured both physical pain and suffering (albeit under sedation) and psychic harm contemplating his imminent demise if he were removed from dialysis.  From July 22 while in palliative care (and his physical pain addressed), he still suffered with the knowledge that the end of dialysis would also lead to his demise.

As for the apprehension of Mr. Southard's impending death, this Court finds that he suffered from mental anguish for knowing his impending death.  Using the analogous cases discussed above and the daily average method discussed with physical pain and suffering analysis, this Court is using the awards Mancuso ($1,000,000 damages in part for anguish for one month), Hyung Kee Lee ($3,750,000 for over three days in part for anguish), and Zambrana ($1,200,000 for eight months apprehending plaintiff's death), their respective daily averages for total pain and suffering were $33,333 for Mancuso, $1,000,000 for Hyung Kee Lee, and $5,000 for Zambrana as comparable.  With the broad range and lack of a stand-alone verdict for apprehension of impending death, this

Court adopts as reasonable compensation the award in <u>Mancuso</u>, <u>supra</u>, 172 A.D.3d at 1936, 100 N.Y.S.3d at 474, of **$33,333** per day; applied to the last eleven days of Mr. Southard's life, reasonable compensation for apprehension his death totals **$366,663.00**.

   3. Medical and Funeral Expenses

  Plaintiff also seeks to recover Mr. Southard's medical bills and funeral expenses (Docket No.1, Compl. ¶¶ 21-23).  A wrongful death plaintiff in New York is entitled to recover "the reasonable funeral expenses of the decedent paid by the distributees," N.Y. Est. Powers & Trusts Law § 5-4.3; <u>Dershowitz</u>, <u>supra</u>, 2015 WL 1573321, at *38. Final medical expenses also are recoverable, <u>see</u> N.Y. Est. Powers & Trusts Law § 11-3.3 (<u>see</u> Docket No. 92, Pl. Trial Br. at 21).

  New York CPLR § 4545 provides that evidence is admissible of any economic losses (including out of pocket damages for medical care, loss of earnings) that were or will with reasonable certainty be replaced or indemnified from a collateral source in order to avoid a double recovery or windfall (Docket No. 88, Gov't Trial Br. ¶¶ 116-17). The Government argues that Mr. Southard's care from his surgery until his death was covered and he and Plaintiff did not have to pay (Docket No. 88, Gov't Tr. Br. ¶ 118; Docket No. 197, Gov't Proposed Findings of Fact ¶ 366; <u>see</u> Docket No. 153, Pl. Tr. at 78-79 (Plaintiff conceding that estate did not have to pay for Southard's medical expenses)).  The Government also points out that Mr. Southard received $300 in veterans' burial benefits (Docket No. 197, Gov't Proposed Findings of Fact ¶ 367; Docket No. 153, Pl. Tr. at 78).

The Government also argues that any wrongful death award should be limited to Mr. Southard's funeral expenses only (Docket No. 196, Gov't Proposed Conclusions of Law ¶ 59), apparently less any collateral source recovered by Mr. Southard or his estate (such as veterans' burial benefits) (see Docket No. 197, Gov't Proposed Findings of Fact ¶ 367).  Plaintiff and Tona testified to paying Southard's funeral expenses (Docket No. 153, Pl. Tr. at 64, 76-78; Docket No. 156, Tona Tr. at 122; Jt. Tr. Ex. 44, funeral home bill).

Regarding Southard's burial expenses, these are reduced by the $300 in veterans' benefits received.  Therefore, Plaintiff is awarded **$5,773.64** (or $6,073.64 less $300 in VA burial benefit), despite the fact that Plaintiff herself (and apparently not the estate), Sonny, and Tona paid the funeral expenses.

As for Mr. Southard's medical expenses from April 1, 2009, until his death, he was in VA care and had no out of pocket expenses.  Plaintiff testified to that (Docket No. 153, Tr. at 78-79).  Therefore, Plaintiff **is not entitled to recover Southard's medical expenses**.

4.  Distributees' Recovery

Plaintiff also alleges damages claims on behalf of Mr. Southard's adult children, seeking to recover in the Third Cause of Action for the deprivation of the direction, guidance, and financial assistance from Mr. Southard (Docket No.1, Compl. ¶¶ 21-23). Plaintiff argues that Mr. Southard's children presented evidence that he provided them with "financial assistance and substantial guidance" (Docket No. 200, Pl. Proposed Conclusion of Law at 45-46).  Sonny testified that Mr. Southard encouraged Sonny to get his G.E.D. and taught him automobile maintenance (id. at 45; Docket No. 155,

Sonny Southard Tr. at 26, 40-42, 93).  Tona testified that Mr. Southard provided her with advice since they reconnected after she turned 18 (Docket No. 156, Tona Tr. at 10, 16).  She also testified that Southard encouraged her to complete her high school education and she did so (id., Tr. at 123).  She did not live with him and was not financially dependent upon him.  His older sons, Howie and Roy, did not testify.

Plaintiff claims Mr. Southard made monetary contributions to his children and provided "countless gifts throughout the years" (Docket No. 200, Pl. Proposed Conclusion of Law at 46; Docket No. 205, Pl. [Corrected] Proposed Findings of Fact ¶¶ 52, 60; Docket No. 155, Tr. at 28, 35, 43, 81), including a total of $3,000 in forgiven loans to Sonny that Mr. Southard declined repayment (Docket No. 205, Pl. [Corrected] Proposed Findings of Fact ¶¶ 60-61; Docket No. 155, Tr. at 81 (borrowing "a couple thousand, 3,000 maybe")).  Plaintiff has not presented other amounts given by him.  Plaintiff contends that Mr. Southard provided emotional and moral guidance to his children, for example advice to his son on relationship and finances (Docket No. 205, Pl. [Corrected] Proposed Findings of Fact ¶¶ 62-64; Docket No. 155, Tr. at 41, 83, 42).  To evidence Southard's paternal relationship, Plaintiff points to his last will (executed at the Buffalo VAMC) which named his four children as beneficiaries (Docket No. 205, Pl. [Corrected] Proposed Findings of Fact ¶ 65; Docket No.115, Tr. at 110).

The Government argues that there was no evidence of economic injury to the distributees because of Southard's death (Docket No. 196, Gov't Conclusions of Law ¶ 88; see id. ¶¶ 84-87).  Mr. Southard had not seen sons Roy and Howie Southard for forty years, between the mid-1960s and 2006 (id. ¶ 89) and Plaintiff produced no evidence these sons or Sonny had any financial support from Southard (id. ¶ 90; see id.

¶¶ 91 (no proof of $100 gift made by Mr. Southard to sons), 93 (no proof Sonny

borrowed $2,000); Docket No. 197, Gov't Proposed Findings of Fact ¶¶ 285-88; Docket

No. 155, Sonny Tr. at 88-89 (in deposition Sonny Southard testified to loans of $2,000)).

Sonny never lived with Mr. Southard (Docket No. 196, Gov't Conclusions of Law ¶ 92).

Tona had no contact with her father, Mr. Southard, from ages two to eighteen and after

her contacts with him were minimal because he was a long-haul trucker and always

busy (id. ¶ 95).  Their relationship was strained from 1999 to 2004 (id.).  Mr. Southard

never financially supported Tona; at the most, he gave Tona advice about completing

her education and carpentry but not actually helping (id. ¶ 97).  Thus, the Government

concludes that claims on behalf of Mr. Southard's children should be dismissed (id.).

Earlier, the Government argued that this case has similar facts to Hartman v.

Dermont, 89 A.D.2d 807, 453 N.Y.S.2d 464 (4th Dep't 1982), in which adult distributees

sued for the wrongful death of their mother (Docket No. 191, Gov't Memo. at 5).

Decedent was living on disability benefits prior to her death and the survivors were self-

supporting adults living out of state and without special needs.  A surviving daughter

testified that decedent mother was her advisor and counsellor.  Considering the

daughter's age (43 years old), her residency, and the fact that decedent lacked special

education or experience which would have a pecuniary impact on the daughter, the

court dismissed the daughter's claim for pecuniary loss.  Id., 89 A.D.2d at 808,

453 N.Y.S.2d at 464-65 (id.).  The Government then cited other New York cases in

which survivors' claims for wrongful death benefits were rejected due to the lack of

evidence of pecuniary injury (id., citing Loehner v. Simons, 239 A.D.2d 468, 469, 657

N.Y.S.2d 447, 448 (2d Dep't 1997); Perez v. St. Vincents Hosp. and Med. Ctr. of N.Y.,

66 A.D.3d 663, 886 N.Y.S.2d 486 (2d Dep't 2009)).

The court in Moldawsky also reduced the daughters' awards (from $200,000 to

$100,000 for college graduate daughter and from $300,000 to $150,000 to high school

student daughter) because "both daughters have already received much of the benefit

of their father's advice and guidance," 14 F. Supp. 2d at 535. Citing other New York

loss of guidance cases, the court in Dershowitz found the range of acceptable damages

was $0 to $75,000 per child, "with larger sums being granted to younger children as well

as adult children who lived with or received financial and household assistance from the

deceased parent," 2015 WL 1573321, at *37, awarding two adult children in that case

$25,000 each and rejecting the argued $1,050,000 sought by each child, id. at *38.

As noted above, New York law recognizes recovery for adult children for their

pecuniary losses from the deprived nurture, care, and guidance from the decedent, e.g.,

McKee, supra, 849 F.2d at 50-52. These cases indicate that adult children recover

when there is proof that the decedent provided significant support to them even in

adulthood; for example, if the adult child has special needs or educational attainments

supported by the now deceased parent. Here, Mr. Southard's four surviving children

received minimal financial support from him in life. The four children are adults in

middle age (see Docket No. 155, Sonny Southard Tr. at 4 (born in 1969); Docket

No. 156, Tona Tr. at 4 (born in 1970)), with their education completed (some at

Southard's urging), and in their jobs or careers; none are dependent upon Mr. Southard.

Plaintiff has not refuted that Mr. Southard in 2009 lacked the resources to provide

monetary support to his children even if he desired (Docket No. 153, Pl. Tr., Mar. 14,

2018, at 71; <u>see</u> Docket No. 191, Gov't Memo. at 6, Ex. E) or that he would have resources in the next few years.  Southard's children already have received much of the benefit of his advice and guidance, <u>see</u> <u>Moldawsky</u>, <u>supra</u>, 14 F. Supp. 2d at 535.

These children (for circumstances beyond their control or much of Mr. Southard's control, through divorces, custody, and Southard's job) had strained or nearly severed relationships with Mr. Southard during their youth and re-established varying, limited relationships with him after their majority.  This adult contact remained limited due to Mr. Southard's work as an over-the-road truck driver.

The Second Circuit recognized the amount of time spent by the deceased parent with his children in determining the reasonable wrongful death award.  That court deemed an award for loss of parental guidance of $75,000 so excessive as to shock the conscience where the decedent was at sea for ten months of the year and only spent two months a year with the spouse and child, <u>O'Rourke v. Eastern Air Lines, Inc.</u>, 730 F.2d 842, 859 (2d Cir. 1984) (reducing award by 50%).  Thus, the amount of time actually spent by Southard with his children reduces any damages award to his estate.

None of these children have medical or other conditions that required assistance or care from Mr. Southard.  None lived with him prior to his final hospitalization. Mr. Southard gave them Christmas and birthday gifts and made forgiven loans to Sonny.  Plaintiff has presented no evidence of Mr. Southard making financial or other guidance to Howie or Roy (both of whom did not testify in this trial).  The total amount evidenced of loans and gifts from Mr. Southard to his children was approximately $2,100 (accepting Sonny's deposition testimony (Docket No. 155, Sonny Tr. at 88-89) and the named gift to Howie).  This Court otherwise accepts the testimony of Plaintiff's

witnesses about money given by Mr. Southard to his children, since few people retain or make receipts for gifts or personal loans and the amounts involve do not warrant documentation.

Plaintiff has not offered proof of the value of the guidance Mr. Southard provided to his children (such as life advice about completing education, relationships, skills training, or advice on home maintenance).  As with Moldawsky, supra, 14 F. Supp. 2d at 535, Southard's children have received much of the benefit of the advice and guidance. With the only amounts in evidence being $2,100 in gifts and essentially forgiven loans and testimony of two children receiving guidance from Mr. Southard; Mr. Southard's age (64 at his death), and factoring in his life expectancy to 84 years old (see Jt. Tr. Ex. 149); and the age of his youngest children (50 and 51); the reasonable amount Plaintiff (on behalf of the estate and these distributees) can recover is **$3,000.00**, including future presents, forgiven loans, and advice that would have been given in the years from 2009 to 2027 had Southard survived (accepting Plaintiff's proffered life expectancy report, Jt. Tr. Ex. 149).

5.   Other Damages

Plaintiff also seeks to recover for Southard's inability to perform household services during the 118 days of his hospitalization.  Plaintiff testified that she managed his personal affairs during his hospital stay (Docket No. 153, Pl. Tr. at 47-48).

Southard's inability during his final days to perform household services is a distinct economic loss from his pain and suffering, Cramer v. Kuhns, 213 A.D.2d 131, 630 N.Y.S.2d 128 (3d Dep't 1995); see 1B N.Y. PJI, supra, 2:280.2, at 933-34.  But these damages are "awarded only for those services which are reasonably certain to be

incurred and necessitated by plaintiff's injuries," 1B <u>N.Y. PJI</u>, <u>supra</u>, 2:280.2, at 934;

<u>Schultz v. Harrison Radiator Div. General Motors Corp.</u>, 90 N.Y.2d 311, 660 N.Y.S.2d

685 (1997), and a jury errs in awarding those services when the plaintiff relied upon the

gratuitous assistance of relatives and friends.  The "standard by which to measure the

value of past and future loss of household services is the cost of replacing the

decedent's services," <u>Mono</u>, <u>supra</u>, 13 F. Supp.2d at 480 (quoting <u>Klos v. New York City</u>

<u>Transit Auth.</u>, 240 A.D.2d 635, 637, 659 N.Y.S.2d 97, 100 (2d Dep't 1997) (citations

omitted)).  To recover for these household services, a plaintiff needs to present

evidence of actual expenditure incurred (or likely to be incurred) to replace these

services, <u>see</u> <u>Hyung Kee Lee</u>, <u>supra</u>, 118 A.D.3d at 754, 987 N.Y.S.2d  at 441.

 In <u>Mono</u>, plaintiff produced an economist who estimated the value of plaintiff's

late wife's household services, 13 F. Supp.2d at 481.  The court held, however that the

award of $378,000 for those services was excessive because the economist assumed

the decedent providing 18 hours of labor each week, an assumption unsupported by the

record, <u>id.</u>

 Here, plaintiff did not introduce any evidence of Mr. Southard's services to others

or for himself.  Plaintiff's testimony implied that Mr. Southard lived alone; Plaintiff

testified that he was divorced from his last wife, Norma, and she had moved back to

Mexico before the divorce (Docket No. 152, Pl. Tr. at 108-09, 118-19).  The record here

only contains reference to Plaintiff's gratuitous management of Mr. Southard's affairs

during his hospitalization such as paying his bills.  Had Plaintiff retained a business

manager, attorney, or accountant to perform these services (or housekeeper to maintain

Southard's residence), she (or Southard) would have incurred an expense.  Absent

proof of the value of Plaintiff's services to her brother or his household services, Plaintiff **cannot recover for loss of Mr. Southard's household services**, Schultz, supra, 90 N.Y.2d at 321, 660 N.Y.S.2d at 689; see also Finney v. Morton, 170 A.D.3d 811, 814, 95 N.Y.S.3d 566, 569 (2d Dep't 2019) (lack of evidence of nature and frequency of services performed by decedent, court rejects as speculative award of household services despite economist valuation of those services); Kastick v. U-Haul Co. of W. Mich., 202 A.D.2d 797, 798, 740 N.Y.S.2d 167, 170 (4th Dep't 2002) (plaintiff presented no evidence of cost of replacing decedent's services in mowing lawn and plowing the driveway, upholding award of no damages for loss of household services).

   6.   Summary of Damages

Therefore, below is a table summarizing Plaintiff's recoverable damages:

| Damage Item | Amount Awarded to Plaintiff |
|---|---|
| Mr. Southard's pain and suffering | $1,740,000.00 |
| Mr. Southard's consciousness of his impending death | $   366,663.00 |
| Mr. Southard's medical expenses | $          0.00 |
| Mr. Southard's funeral expenses | $     5,773.64 |
| Damages for Mr. Southard's wrongful death | $          0.00 |
| Mr. Southard's heirs' loss of Mr. Southard's direction, guidance, and financial assistance | $     3,000.00 |
| Loss of Mr. Southard's income | $          0.00 |
| Household services paid by Plaintiff | $          0.00 |
| **Total** | $2,115,436.64 |

## VI.   CONCLUSION

Upon consideration of the evidence presented at trial and the arguments of the parties, this Court finds that Defendant and its agents **failed to satisfy all applicable standards of care** in the diagnosis and treatment of Howard Southard.  Plaintiff has proven that Mr. Southard and his estate suffered the damages to the extent found above.  Based upon these Findings of Fact and Conclusions of Law, judgment is **granted** for Plaintiff.

## VII.   ORDERS

IT HEREBY IS ORDERED that judgment be entered for Plaintiff;

FURTHER, that Plaintiff recovers a total of **$2,115,436.64** from Defendant for decedent Howard Southard's pain and suffering, death, and the loss of parental support by his children;

FURTHER, that the Clerk of Court is directed to enter a Judgment in favor of Plaintiff, consistent with this Decision and Order, pursuant to Rules 52(a) and 58 of the Federal Rules of Civil Procedure including post-judgment interest from the date judgment is entered, see 28 U.S.C. § 2674;

FURTHER, that the Clerk of Court is directed to close this case.


SO ORDERED.


Dated:       June 25, 2020
             Buffalo, New York

                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge